In the Matter of Spencer Jerome TILLERY, Bankrupt.

BILL SWAD LEASING COMPANY, Appellant,

v.

Henry A. STIKES, Sr., Trustee, Appellee.

No. 76–3800.

United States Court of Appeals, Fifth Circuit.

April 28, 1978.

Edward B. McDermott, Mobile, Ala., for appellant.

E. Graham Gibbons, Mobile, Ala., Charles S. Street, Mobile, Ala., for appellee.

Before BROWN, Chief Judge, AINSWORTH and VANCE, Circuit Judges.

PER CURIAM:

 Affirmed on the basis of the Order of Bankruptcy Judge Will G. Caffey, Jr., dated February 17, 1976, which Order was affirmed by the District Court, Judge Virgil Pittman, on August 31, 1976, and is attached hereto.

AFFIRMED.

## ORDER ON COMPLAINT

At Mobile in said District on the 17th day of February, 1976, before Will G. Caffey, Jr., Bankruptcy Judge:

This matter having come on for hearing upon the Complaint of Henry A Stikes, Sr., Trustee, against Bill Swad Leasing Company (Swad) seeking to sell, free and clear of any lien, security interest, or claim of said defendant, one (1) 1974 Lincoln Continental Mark IV automobile; summons and notice of trial having been regularly issued and served; and upon the answer and counterclaim of Swad seeking to recover possession of said vehicle; and the said Trustee and his attorney, E. Graham Gibbons, having appeared; and Edward B. McDermott, attorney for Swad, having appeared; and evidence having been presented;

Now, therefore, upon said Complaint, answer and counterclaim, and upon the evidence presented, the Court finds, concludes and orders as follows:

## FINDINGS OF FACT

1. Spencer Jerome Tillery (Tillery) filed his voluntary petition in bankruptcy on July 18, 1975; and Henry A. Stikes, Sr. is the duly appointed, qualified and acting Trustee of this estate in bankruptcy.

2. At the time of the filing of his petition herein Tillery had in his possession the vehicle involved herein. The Trustee took possession of the vehicle from the bankrupt, and now has it in storage awaiting the determination of Swad's claim thereto.

3. On April 12, 1974 Tillery entered into a contract with Swad relating to this vehicle. The contract is evidenced by two documents, executed contemporaneously, and each referring to the other. One of these documents is entitled "Lease Agreement" and the other is entitled "Vehicle Lease Order". (Defendant's Exhibits 1 and 2).

Under the terms of the contract, Tillery purportedly "leased" from Swad the 1974 Lincoln Mark IV automobile described in the "Vehicle Lease Order" for an initial term of 36 months at a "rental rate" of $230.00 per month plus sales tax of $9.20 per month, or a total payment of $239.20 per month to be paid on the 15th day of each month.

The "Lease Agreement" provided: "This agreement is one of leasing only, and the Lessee shall not have or acquire any right, title, or interest in or to the vehicle except the right to use or operate it as provided herein."

Under the contract, the Lessee was required to maintain the vehicle in good operating condition; and to pay all costs of maintenance and operation. He was also required to provide complete insurance coverage, as specified on the reverse side of the "Vehicle Lease Order", including full comprehensive, fire, theft and collision damage coverages.

The Lessee was further required to pay all licenses and taxes on the vehicle, including specifically, State License, Sales Tax, Excise Tax, and Personal Property Tax.

At the end of the normal lease term, or extension thereof, or upon earlier termination of the agreement, the Lessee was required to return the vehicle to the Lessor's place of business in the same condition as when delivered, ordinary wear and tear excepted.

The termination provisions of the agreement are set out in haec verba:

"Lessee may terminate this lease with respect to any vehicle at any time after six (6) months from the date of delivery of the same by giving Lessor thirty (30) days notice in writing, provided that Lessee shall bear any loss or receive any gain which results from final disposition of a vehicle. When a vehicle is returned to Lessor upon such termination or any other termination or expiration hereof, Lessor shall promptly obtain and accept the

highest available cash offer at wholesale for the vehicle and notify Lessee in writing of the gain or loss computed pursuant to this paragraph. All payments due Lessor as a result of any termination shall be due as soon as the amount of the payment is ascertained. The gain or loss on any final disposition shall be the difference between the offer received and the Termination Value of the vehicle, as defined below:

a. If the lease is terminated prior to the end of the initial term, the Termination Value shall be the Depreciated Value at the end of the initial term as specified in Lessee's Order, plus the product of the Premature Termination Factor times the number of months from the effective date of termination to the end of the initial term, plus the unamortized portion of any annual prepaid license fees and applicable taxes paid by the Lessor.

b. If the lease is terminated at the end of the initial term the Termination Value Shall be the Depreciated Value as specified in the Lessee's Order, plus the unamortized portion of any annual prepaid license fees and applicable taxes paid by the Lessor.

c. If the lease is terminated during any extended term, the Termination Value shall be the Depreciated Value at the end of the initial term less the product of the monthly Depreciation Reserve for the extended term as specified on Lessee's Order times the number of months that have elapsed since the beginning of the extended term, plus the unamortized portion of any annual prepaid license fees and applicable taxes paid by Lessor.

d. If any vehicle is lost or stolen or so damaged that it cannot in Lessor's judgment be economically repaired, the lease with respect to such vehicle shall terminate effective thirty (30) days from the date of notice by Lessee to Lessor of the loss, theft or damage. Lessee shall pay Lessor the Termination Value of such vehicle computed as provided in the applicable sub-paragraph above, on the effective date of termination, less the proceeds from any insurance settlement paid the Lessor."

The "Depreciated Value at End of Initial Term" is shown on the "Vehicle Lease Order" to be $3,570.00; and the "Premature Termination Factor" is shown on the same document to be $166.68. The "Depreciation Reserve" for an extended term is not shown on the order form.

The Lessee was required to indemnify and hold harmless the Lessor from any damage, loss, theft, or destruction of the vehicle; as well as against any claims arising out of the use and operation of the vehicle.

The default provisions of the agreement provided that if the Lessee failed to pay any monthly payment when due, or defaulted in the performance of any of the other terms and conditions, or if the motor vehicle was levied upon or encumbered, or in the event of Lessee's bankruptcy, the Lessor could take immediate possession of the vehicle; and upon termination pursuant to these default provisions, the Lessee would be responsible for the payment of all amounts due under the lease agreement through the date of such termination, together with the loss (if any) resulting from the sale of the vehicle pursuant to the provisions of the above quoted termination provisions (with the gain, if any, to be applied to the payment of amounts due under these default provisions), together with liquidated damages in the amount of $100.00, and, in addition, any specific damages which the Lessor may have sustained as a result of the default, including costs of repossession and attorneys' fees.

The Lessee was required to make a "Security Deposit" of $1,000.00 which was forfeited if the Lessee failed to accept delivery of the vehicle, and which otherwise stood as security for and could be applied to the payment of any sums due to the Lessor under the agreement.

The agreement provided that it would be interpreted under and governed by the law of the state in which Lessor maintained its principal place of business. Although no

evidence was introduced in this regard, the contract was entered into in Ohio and the business address of Swad was listed as 465 South Hamilton Road, Columbus, Ohio; and presumably this was its principal place of business.

4. The evidence does not reflect the filing of a UCC Financing Statement relating to this transaction in Alabama, nor the reservation of any lien on a title certificate issued in Ohio.

## CONCLUSIONS OF LAW

A. The question presented for determination is whether the contract between Swad and Tillery constituted a true or "pure" lease, or whether it was, in fact, a lease intended for security. If it was a "pure" lease then the vehicle belongs to Swad and the Trustee has no interest therein other than being compensated for whatever expenses he has incurred in connection with the protection and preservation of Swad's property. However, if it was a lease intended for security, the Trustee is entitled to prevail as the holder of Tillery's beneficial title therein because no financing statement was filed by Swad to perfect its security interest as required by the Uniform Commercial Code and/or no lien in its favor was entered upon any certificate of title.

B. Although the contract is to be interpreted and governed by the law of Ohio as declared therein; its effectiveness and rights thereunder are, in part, controlled by the laws of Alabama.

See: Title 7A, Code of Ala., Sec. 1–105, Sec. 9–102 and Sec. 9–103

And, of course in this proceeding the rights of the parties are further controlled by the Bankruptcy Act itself.

Article 9 of the Uniform Commercial Code, adopted in both Alabama and Ohio, provides that it applies so far as concerns any personal property within the jurisdiction of the State, as to any transaction (regardless of form) which is intended to create a security interest in personal property whether created by contract, pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract, and lease or consignment intended as security.

Title 7A, Code of Ala., Sec. 9–102
Ohio Revised Code, Sec. 1309.02

A "security interest" is defined in UCC Sec. 1–201(37) as: An interest in personal property which secured payment or performance of an obligation. This section further provides that the retention or reservation of title by a seller of goods notwithstanding or delivery to the buyer is limited in effect to a reservation of a "security interest." Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest." Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Title 7A, Code of Ala., Sec. 1–201(37)
Ohio Revised Code, Sec. 1301.01(KK)

Under Alabama law in order to perfect a security interest in a motor vehicle (prior to the 1975 Models) a financing statement, in proper form, must be filed of record either in the Office of the Judge of Probate of the County of the debtor's residence or in the Office of the Secretary of State, depending on the circumstances.

Title 7A, Code of Ala., Sec. 9–401 and Sec. 9–402

Under Ohio law, a security interest in a motor vehicle must be noted on the vehicle title certificate in order to be perfected.

Ohio Revised Code, Chap. 4505

D. In order to determine the question presented here, the Court must look at all of the provisions of the contract between the parties; and in doing so it is not bound by the denomination of the parties as "lessor" or "lessee" or the agreement as a "lease"; but must look beyond the lan-

guage used to determine the rights and obligations of the parties.

At first blush the contract appears to be a "pure" lease. It is denominated a "lease" and the parties as "Lessor" and "Lessee." It calls for "rental payments", and the "title" to the vehicle is retained in the "Lessor". But upon closer examination it is obvious that its real purpose and intent is obfuscated by the terminology; and I am satisfied, after a careful analysis of its terms and conditions and the rights and obligations of the parties thereto, that it is in reality a "lease intended for security".

Perhaps the most revealing provisions of the "Lease Agreement" are those relating to "Termination" and "Return of Vehicle". Under these provisions, upon termination of the agreement prior to the expiration of the initial term (36 months) the "Lessee" is required to return the vehicle to the "Lessor" who "shall * * * accept the highest available cash offer at wholesale for the vehicle", and notify the "Lessee" of the gain or loss, which is the difference between the wholesale price accepted and the "Termination Value" to be determined by adding the "Depreciated Value" ($3,570.00) to the product of the "Premature Termination Factor" ($166.68) times the number of months remaining in the initial term.

An example might be clarifying: If the lease is terminated at the end of one year (12 months), the "Termination Value" would be computed as follows:

| | |
|---|---|
| Depreciated Value | $3,570.00 |
| Premature Termination Factor— | |
| $166.68 × 24 months | 4,000.32 |
| Amount due from "Lessee" | $7,570.32 |

Against this figure is to be off-set the wholesale price of the vehicle to be received upon its disposition. For instance, if the vehicle brought $6,500.00 at wholesale, the "Lessee" would still owe $1,070.32 to the "Lessor"; and if it brought more than $7,570.32, the "Lessee" would recover the gain.

Again, under these provisions, if the contract runs for its full term and is terminated, the "Lessee" would owe the "Depreciated Value" ($3,570.00), off-set by the amount received on a wholesale disposition; and would receive any "gain" over that amount.

In the above discussion, "the unamortized portion of any annual prepaid license fees and applicable taxes paid by the Lessor" (included in the Termination provisions) has been ignored, both because of clarity and because the agreement requires the "Lessee" to pay all license fees and taxes.

The termination formula recognizes the equity of the "Lessee", in the vehicle because he is required to bear the loss or receive the gain from its wholesale disposition. In addition, his equity extends to the retail value of the vehicle which, in effect, he is required to pay under the contract. If the contract runs through the completion of the initial term (36 months) the "Lessor" will have received through monthly "rental payments" the sum of $8,611.20 and is still entitled to receive the sum of $3,570.00 by direct payment from the "Lessee" and/or from disposition of the vehicle. This constitutes a total payment of $12,181.20; and although no evidence was presented as to the retail sales price of the vehicle on April 12, 1974, it appears to be reasonable to presume that the total amount received would constitute the retail price of the vehicle plus a substantial interest charge for financing the transaction over a period of three (3) years. Mathematically this same result would occur at an earlier termination.

An equity in the "Lessee" is one of the distinctive characteristics of a lease intended for security. As stated by Judge Hiller in the case of *In re Royer's Bakery, Inc.* (ED–Pa., 1963) 1 UCC Rep. 342:

" ___ Whenever it can be found that a lease agreement concerning personal property contains provisions the effect of which are to create in the lessee an equity or pecuniary interest in the leased property the parties are deemed as a matter of law to have intended the lease as security within the meaning of Sections 9–102 and 1–201(37) of the Uniform Commercial Code."

See Also: In re Lockwood
16 UCC Rep. 195 (D–Conn., 1974)

E. In addition to the equity, or beneficial interest of the "Lessee" in the vehicle, the agreement contains other indicia of a sale rather than a lease:

(1) The payments made by the "Lessee" include an amount specifically denominated as "Sales Tax". Only if a sale was involved would a sales tax be incurred.

(2) The "Lessee" is required to provide full comprehensive, fire, theft and collision insurance coverages on the vehicle, thereby protecting its full value, not just his "leasehold" interest therein.

(3) The "Lessee" is required to pay all licenses, registration fees, excise taxes, personal property taxes, sales taxes and all other taxes on the vehicle. These obligations normally fall on the buyer or owner of a motor vehicle.

(4) In the event of loss or destruction of the vehicle, the "Lessee" is to pay the "Termination Value" of the vehicle (less the proceeds of any insurance settlement).

(5) The "Lessee" is required to indemnify and hold harmless the "Lessor" from and against any damage, loss, theft or destruction of the vehicle.

(6) A "security deposit" of $1,000.00 was required of the "Lessee"; this being the equivalent of a down payment on the purchase price of the vehicle.

F. Although the "Lease Agreement" provides that the "Lessee" shall not have or acquire any right, title or interest in or to the vehicle, the insertion of this provision is not controlling and must be interpreted in the light of the other provisions of the contract.

> *James Talcott, Inc. v. Franklin National Bank of Minneapolis*
> 10 UCC Rep. 11 (Minn.Sup.Ct., 1972)
> Title 7A, Code of Ala., Sec. 9–202
> Ohio Revised Code, Sec. 1309.13

Likewise, although the agreement does not specifically contain an option to purchase, such an omission is not controlling. Just as the *inclusion* of an option to purchase does not in and of itself make the lease one intended for security; so also, the *exclusion* of such an option does not ipso facto make it a "pure lease". The determi-

nation must be made upon consideration of all the factors involved in the contract.

> *In re Telemax Corp.*
> 10 UCC Rep. 1316 (SD–NY, 1971)
> *In re A & T Kwik-N-Handi, Inc.*
> 13 UCC Rep. 960 (Md–Ga., 1973)

G. I, therefore, conclude from a careful consideration of all of the contract provisions and the rights and obligations of the parties thereto that the agreement between Swad and Tillery was a lease intended for security, and not a "pure" lease.

> See: *In re Brothers Coach Corp.*
> 9 UCC Rep. 502 (ED–NY, 1971) (involving a contract containing similar provisions with different terminology)
> *Avis Rent-A-Car System, Inc. v. Franklin*, 82 Misc.2d 66, 366 N.Y.S.2d 83, 16 UCC Rep. 895 (1975)

Since the security interest of Swad in the vehicle was neither perfected under the law of Alabama, nor under the law of Ohio, on the date of the filing of the petition in bankruptcy herein, the rights of the Trustee in said vehicle are superior to those of Swad, and he is entitled to sell the vehicle as an asset of this estate in bankruptcy, free and clear of any lien, security interest or claim of Swad.

> Bankruptcy Act, Sec. 70 a and c
> Title 7A, Code of Ala., Sec. 9–301
> Ohio Revised Code, Sec. 1309.20

### ORDER

Now, therefore, it is ORDERED, ADJUDGED and DECREED that:

1. The relief sought in the counterclaim of Bill Swad Leasing Company be, and the same hereby is, DENIED.

2. The relief sought in the Complaint of Henry A. Stikes, Sr., Trustee, be, and the same hereby is, GRANTED; and said Trustee is hereby authorized and directed to sell, free and clear of any lien, security interest, or claim of Bill Swad Leasing Company, the following described personal property, viz:

> One (1) 1974 Lincoln Continental Mark IV,
> Coupe Automobile, SN 4Y89A875347;

subject to notice to creditors as required by Bankruptcy Rule 203 and to final approval by this Court.