[No. 3644-8-III.   Division Three.   June 30, 1981.]

RAINIER NATIONAL BANK, *Respondent,* v. INLAND
MACHINERY COMPANY, *Appellant.*

*Paul M. Larson* and *Brooks & Larson,* for appellant.

*James R. Irwin* and *Shidler, McBroom, Gates & Baldwin,* for respondent.

Munson, J.—Inland Machinery Co. appeals from a summary judgment holding that Rainier National Bank's previously perfected security interest, which included after-acquired property, had priority over the subsequent purchase money security interest of Inland Machinery Co. (Inland) because of Inland's failure timely to file pursuant to RCW 62A.9–312(4). Inland and Rainier National Bank (Rainier) are secured creditors of Tonasket Timber Co. (Tonasket).

In October 1978, Tonasket executed a security agreement in favor of Rainier covering all of its equipment, including after–acquired property. Rainier filed an appropriate financing statement. In November of 1978, Tonasket executed two documents, a machine rental agreement and an option to purchase, and took possession of a Caterpillar front loader. The machine rental agreement was for the period November 13, 1978, to April 13, 1979, at $6,000 per month, plus taxes of $306 per month. The customer was to provide insurance. Handwritten into this agreement, in a section labeled "Comments" was the following:

> Rental to convert to contract at end of 4 months. Credit of $4,000 for 966A S/N33A668 and $2,000 for 966A S/N33A1009 (not running now—all components to be sent in) to apply to down payment.

Below that "Comment" was a printed section of the form

containing a holdover provision which read:

D) Any holdover beyond the term of this Rental as set forth above shall extend the term of the Rental on the same terms and conditions as set forth herein except that during any holdover period, Owner MAY REPOSSESS the equipment and terminate the Rental, with or without cause, on 24 HOURS NOTICE. On termination of this Rental during any holdover period, the rent for the entire period shall be recomputed on the lowest basis provided above and adjusted with User accordingly.

Attached to the rental agreement and executed at the same time and incorporated as part thereof is an option to purchase extended to Inland at or before the expiration of the rental term, which states that the purchase price of the equipment is $121,304 plus applicable taxes; and that credit shall be given for all monies paid by Tonasket to Inland except 1 percent of the purchase price will be credited to Inland each month for allowing the option to remain in force. It further states that notice of the exercise of the option must be made in writing not less that 30 days prior to the expiration of the rental term and states in capital letters on the printed form:

IT IS AGREED AND UNDERSTOOD THAT THIS IS AN OPTION TO PURCHASE ONLY AND IS NOT TO BE CONSTRUED AS OR UNDERSTOOD TO BE A CONDITIONAL SALES CONTRACT.

Tonasket took possession of the equipment in November 1978, and sometime before February 5, 1979, indicated to Inland it wished to exercise its option. On February 5, Inland signed and mailed a conditional sales contract and security agreement dated February 15, 1979, to Tonasket's president at his office in the state of Michigan. Tonasket's president signed and mailed the documents back to Inland on February 26, 1979. On March 5, less than 10 days after Tonasket signed the documents, Inland filed a financing statement on the equipment.

Subsequently, Rainier began an action on Tonasket's promissory note and sought to foreclose an existing mort-

gage to declare the priority of security interests and for damages. Several defendants were named, including Tonasket and Inland. Tonasket had failed to keep current its obligations to Inland; therefore, as between Inland and Rainier the only issue was the priority of their relative security agreements. Both parties moved for summary judgment on that issue; the trial court found in favor of Rainier National Bank.

The issues presented are whether the original instruments, the rental agreement and option to purchase, were a true lease with an option or a security agreement, which creditor had the priority interest and the amount of that interest.

RCW 62A.1–201(37)[1] states in part:

Unless a lease . . . is intended as security, reservation of title thereunder is not a "security interest" . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal

---

[1]RCW 62A.1–201(37):

"'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (RCW 62A.2–401) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under RCW 62A.2–401 is not a 'security interest', but a buyer may also acquire a 'security interest' by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (RCW 62A.2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

consideration does make the lease one intended for security.

The trial court held as a matter of law that the option to purchase was a disguised security transaction; that Inland had failed to file the necessary financing statement within 10 days of Tonasket's taking possession of the equipment; and pursuant to RCW 62A.9–312(4),[2] Rainier's after-acquired property security interest had priority for the full value of the equipment and not merely Tonasket's equity therein.

■ Our review of summary judgment is limited to determining whether there is any genuine issue of material fact existing between the parties and whether Rainier was entitled to judgment as a matter of law. *Nance v. Metropolitan Transit Corp.*, 3 Wn. App. 99, 473 P.2d 207 (1970).

I
### CONSTRUCTION OF THE LEASE DOCUMENTS

■■ Our initial inquiry is to the documents themselves. *Leasing Serv. Corp. v. American Nat'l Bank & Trust Co.*, 19 U.C.C. Rep. Serv. 252 (D.N.J. 1976). The statute, RCW 62A.1–201(37) states: "Whether a lease is intended as security is to be determined by the facts of each case; . . ." If the lease is unambiguous, if it purports to be a lease, and if it gives to the lessee no rights of determination thereof, its meaning shall be deduced from the language of the instrument itself. However, if the language is ambiguous, it is the "duty of the court to search out the intent of the parties by viewing the contract as a whole and considering all the circumstances surrounding the transaction, including the subject matter and the subsequent acts

---

[2]RCW 62A.9–312(4):

"(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

of the parties." *Fancher Cattle Co. v. Cascade Packing, Inc.*, 26 Wn. App. 407, 409, 613 P.2d 178 (1980). Whether a written instrument is ambiguous is a question of law for the court. *Fancher Cattle Co. v. Cascade Packing, Inc., supra; R.A. Hanson Co. v. Aetna Ins. Co.*, 26 Wn. App. 290, 295, 612 P.2d 456 (1980). Ambiguous means "'Capable of being understood in either of two or more possible senses.'" *Ladum v. Utility Cartage, Inc.*, 68 Wn.2d 109, 116, 411 P.2d 868 (1966). Further, parol evidence may be used to explain ambiguities in written instruments and to ascertain the true intent of the parties. *In re Tillery*, 571 F.2d 1361 (5th Cir. 1978); *Levy v. North Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 852, 586 P.2d 845 (1978); *Green River Valley Foundation, Inc. v. Foster*, 78 Wn.2d 245, 473 P.2d 844 (1970).

Here, ambiguity is intrinsic in the documents themselves which provide for a 5–month period in one portion of the rental agreement, while a handwritten portion sets a 4–month rental "to convert to contract." While the court did find that the 4–month period for the conversion to a conditional sales contract was intended to be a security agreement, it made no specific finding as to the parties' intent, and whether the 5–month period retained validity. There is an affidavit from the sales representative of Inland that this writing was inserted to assure Tonasket that the rental payments, less the 1 percent, would be applied toward the purchase price. While that affidavit was belatedly filed, it was considered by the trial judge prior to entry of the summary judgment order.[3] The insertion of two different time periods within the same instrument created an ambiguity

---

[3]Rainier attacks the court's consideration of this affidavit, but the court may accept affidavits any time prior to issuing its final order. *Felsman v. Kessler*, 2 Wn. App. 493, 468 P.2d 691 (1970). Rainier also attacks the affidavit because it *does not recite that it is based on personal knowledge.* CR 56(e), relating to summary judgments, only requires the content of an affidavit be based on personal knowledge, not that it recite that it is based on personal knowledge. We find no error in the court's considering this documentation.

as to the intent of the parties; accepting as true the affidavit, the language merely supports the option to purchase which is attached to the agreement. On summary judgment, all evidence must be viewed in a light most favorable to the nonmoving party. The credibility of the affiant was an issue, as was the purpose of the insertion and the parties' intent reflected thereby. In short, the matter should not have been decided on summary judgment: whether the handwritten 4–month period should control is a question of fact. Because of the ambiguity inherent in the document, the court must entertain parol evidence to determine whether the original 5–month provisions or the handwritten insertion regarding 4 months will control; and if the latter, whether automatic conversion to contract was intended.

Clearly, if the handwritten "Comments" control, the court was correct in finding that this was a security agreement. Such a lease is in fact a tax avoidance device, in which the credit of the lessor is used by the lessee to finance the purchase of the equipment. This is the type of agreement article 9 of the Uniform Commercial Code was designed to cover. *Wo Co. v. Benjamin Franklin Corp.*, 562 F.2d 1339 (1st Cir. 1977); *Leasing Serv. Corp. v. American Nat'l Bank & Trust Co.*, *supra; In re Transcontinental Indus., Inc.*, 3 U.C.C. Rep. Serv. 235 (N.D. Ga. 1965).

## II
### LEASE OR SECURITY AGREEMENT

If the court gives credence to the 5–month rental, it must then determine whether the rental agreement was intended as a true lease or as a disguised security agreement. In *Courtright Cattle Co. v. Dolsen Co.*, 94 Wn.2d 645, 656, 619 P.2d 344 (1980), the court, quoting from *All–States Leasing Co. v. Ochs*, 42 Ore. App. 319, 324–25, 600 P.2d 899 (1979), adopted several relevant considerations (set forth at the margin for clarity) typical of those considered in other jurisdictions:

[T]he presence of certain factors can be indicative, including, but not limited to:

(1) whether the lessee is given an option to purchase the equipment, and, if so, whether the option price is nominal . . .

(2) whether the lessee acquires any equity in the equipment;

(3) whether the lessee is required to bear the entire risk of loss; or

(4) pay all charges and taxes imposed on ownership;

(5) whether there is a provision for acceleration of rent payments, and

(6) whether the property was purchased specifically for lease to this lessee.

A

Examining Those Factors Seriatim

We find, first, that RCW 62A.1–201(37) recognizes that there may be a true lease which includes an option to purchase, where it was not the intent of the parties that the lease be for security. When a lease, with or without an option, entitles a lessee to become the owner of property for no or only nominal consideration, by statute, the lease is one intended for security.[4] This was the case in *Courtright Cattle Co. v. Dolsen Co., supra.* For the most part, decisions from other jurisdictions where the amount of the purchase price at the time of option was less than 25 percent of the fair–market value have been held to be for nominal amounts. *See National Equip. Rental, Ltd. v. Priority Elecs. Corp.,* 435 F. Supp. 236 (E.D.N.Y. 1977), citing cases in which the option price was 2.7 to 4 percent of the total rental value. *See also* Annot., 76 A.L.R.3d 11 (1977). Likewise, security agreements have been found in other cases where economic reality would as a practical matter obligate the lessee to pay an amount substantially equal to the fair–market value of the equipment, or where the rental

---

[4]Consideration may be "nominal" either in the absolute sense—*e.g.,* $1—or relative to the value of the machine. For example, consideration of $1,000 for a machine worth $10,000 would be nominal.

price exceeded the market value of the equipment plus what a reasonable interest would be for purchasing the equipment on installment contract. *Rushton v. Shea,* 419 F. Supp. 1349 (D. Del. 1976); *In re Gehrke Enterprises, Inc.,* 28 U.C.C. Rep. Serv. 794 (Bankr. Ct. W.D. Wis. 1979); *In re Lakeshore Transit–Kenosha, Inc.,* 7 U.C.C. Rep. Serv. 607 (E.D. Wis. 1969); *In re Alpha Creamery Co.,* 4 U.C.C. Rep. Serv. 794, 798 (W.D. Mich. 1967); *In re Washington Processing Co.,* 3 U.C.C. Rep. Serv. 475 (S.D. Cal. 1966); *Eimco Corp. v. Sims,* 100 Idaho 390, 598 P.2d 538 (1979); *see also* Cougan, *Leases of Equipment and Other Unconventional Security Devices: An Analysis of UCC § 1–201(37) and Article 9,* 73 Duke L.J. 909 (1973); 1 U.C.C. Serv. § 4A.07[1] (Bender 1980).[5]

The second factor in *Courtright* was whether the lessee acquired equity in the equipment. *In re Royer's Bakery, Inc.,* 1 U.C.C. Rep. Serv. 342, 345 (E.D. Pa. 1963), the court defined equity as follows:

> By crediting earlier payments of rent to the purchase price, the lessee is accorded an equity or pecuniary interest in the subject matter of the lease which he may recover at his option.

Thus, an equity arises where the lessee acquires an enforceable ownership interest in the collateral. *See In re Joe Necessary & Son, Inc.,* 27 U.C.C. Rep. Serv. 551 (W.D. Va. 1979); Hawkland, *The Impact of the Uniform Commercial Code on Equipment Leasing,* 72 U. Ill. L.F. 446, 450 (1972).

Requirements that the lessee bear the entire loss, pay all charges and taxes imposed on ownership, or make accelerated rental payments are three factors mentioned in *Courtright* which have been considered in other jurisdictions. *See In re Tillery, supra; In re Joe Necessary & Son, Inc.,*

---

[5]The Internal Revenue Service has its own means for determining the distinctions between leases and sales for tax purposes; *see* Rev. Rul. 55–540, 1955–2 C.B. 39; Rev. Rul. 68–590, 1968–2 C.B. 66; *see also* Rev. Proc. 75–21 1975–1 C.B. 752 *modified,* Rev. Proc. 76–30 1976–2 C.B. 647.

*supra; Leasing Service Corp. v. American Nat'l Bank & Trust Co., supra; In re Transcontinental Indus., Inc., supra; U C Leasing, Inc. v. Laughlin,* 96 Nev. 157, 606 P.2d 167 (1980).

While these are three factors which should be considered, it must be remembered these costs, insurance, taxes, and the like, are going to be borne by one party or the other. The lessor is either going to include those costs within the rental charge or agree to a lower rent if the lessee takes responsibility for them. The provision for acceleration of rental payments may be relevant, depending upon other provisions of the lease. *See Computer Sciences Corp. v. Sci–Tek, Inc.,* 367 A.2d 658 (Del. Super. Ct. 1976).

The sixth factor set forth in *Courtright* is whether the property was purchased specifically for lease to this lessee. This is of particular interest in a financial transaction or installment sale when the lessor is not the real provider of the equipment. *In re Transcontinental Indus., Inc., supra.* Here, this factor may not be as relevant since the lessor is the actual supplier of the equipment.[6]

## B
### Additional Factors From Other Jurisdictions

Other factors which have been considered include whether the lessor disclaims all warranties as to the equipment and the lessee agrees to hold the lessor harmless from all liability associated with the equipment, *U C Leasing, Inc. v. Laughlin, supra;* whether a security interest has been extended to other equipment of the lessees, *Computer Sciences Corp. v. Sci–Tek, Inc., supra;* and lastly, whether the lessee treats the lease as a lease for tax purposes, *In re*

---

[6]Although the lease recites that the equipment was procured for the lessee, again parol evidence is admissible to determine whether this was true. This is because the factors considered here must necessarily go beyond the face of the document; the parol evidence exclusion goes only to interpreting the agreement as between the parties to that agreement. We are interested in the actual facts surrounding the transaction.

*Shell,* 390 F. Supp. 273 (E.D. Ark. 1975); *In re Transcontinental Indus., Inc., supra; In re Royer's Bakery, Inc., supra;* Accounting Principles Board Opinion No. 5, cited in Coogan, *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9,* 1973 Duke L.J. 909, 968.

The characteristics of a true lease are designated in *In re Alpha Creamery Co., supra* at page 798 as:

> (a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.
> (b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.
> (c) Rentals which are not excessive and option purchase price which is not too low.
> (d) Facts showing that the lessee is acquiring no equity in leased article during the term of lease.

The court in *In re Alpha Creamery Co., supra* at page 798, found the

> option price was more than nominal, the lessee acquired no equity during the lease term, the option purchase price at the termination of the lease term was approximately an additional 32% of the list price indicating that the parties did not intend that the lease with option to purchase created a security interest . . .

and held the instrument was a true lease, thus negating the requirement that a financing statement be filed.

Where there is a de facto commitment by the lessee to pay substantially the economic value of the lease equipment, a security agreement is easy to find. 1 U.C.C. Serv. § 4A.07(1) (Bender 1980). As to closer cases, the court must decide on balance whether the bargain struck by the parties must be treated as a lease or security.[7]

Because the trial court did not comment on the rental

---

[7]What makes this case unusual is the extremely short period of the lease. Our research discloses no case where a 5–month lease was considered, much less held, a security. But the question here is merely made closer, not foreclosed by, the short lease term. If the trial court were to find the parties intended a 5–month

agreement as to the 5–month period, we have set forth some of the factors which the court should consider if in fact it does not find that the handwritten portion relating to the 4–month rental period with a conversion to a conditional sale contract incorporated the intent of the parties. If the trial court finds that the rental agreement, regardless of the rental period, was intended to be a security transaction, the balance of this opinion becomes superfluous. However, if the court finds it is a true lease, then we must discuss the other assignments of error.

## III
### TIMELY FILING OF FINANCING STATEMENT

The next issue is whether there was a timely filing of the financing statement. The contract of sale was mailed February 5, dated February 15, but not returned signed until after February 26, and filed on March 5. The trial court held in the alternative: (a) that the rental agreement was not a true lease, inasmuch as it did contain the 4–month provision with conversion to conditional sales contract, and that the financing statement had not been filed within 10 days of the execution thereof; or (b) if it was not considered a security agreement, Inland was still delinquent in filing its financing statement because Tonasket as a "debtor," had taken possession of the "collateral" more than 10 days prior to the filing. RCW 62A.9–312(4) requires filing within 10 days of the debtor taking possession of the collateral. When such a filing is made, the later–perfected purchase money security agreement takes priority over pre-

---

lease only, with no requirement of purchase after that date, and that the purchase–option price was substantially equivalent to the fair–market value of the equipment, a strong case could be made for the lease being, in fact, a true lease. The other factors, of course, must be considered. Rainier urges that the holdover provisions contemplate an indefinite lease period with eventual conversion to sale for nominal consideration. This, too, is an issue of fact for the trial court— whether the documents may be construed to give an option for only the rental term, or for the holdover term as well, abides the court's determination of the intent of the parties.

viously perfected security interests with after–acquired property clauses.

As to the first position of the trial court, if on remand it finds that the lease/option agreement was not a true lease, the ruling is correct because that transaction occurred in November, and the filing occurred the following March. However, as to the second conclusion, that in these circumstances the seller must file within 10 days after the debtor takes possession of the equipment, we disagree.

The statute is subject to two interpretations: (1) "Security interest" as defined in RCW 62A.1–201(37) is very broad—sufficiently broad to include any lease as an "interest in personal property . . . which secures payment or performance of an obligation." The lessee is in possession; he has at least a lessee's interest; and the lease secures payment or performance of his financial obligation; or (2) A true lease with an option to purchase, which places possession in the lessee, does not create a security interest until the parties create one by completing the purchase agreement. In this instance, the equipment does not acquire the status of "collateral" until the agreement is signed; then the 10–day period of RCW 62A.9–312(4) begins to run and filing must occur within that period.

As to (1), arguably, this broad definition should apply except where specifically limited. Thus, where a lease is not intended as security, it might nevertheless be a "security interest" for the purpose of other definitional sections— such as RCW 62A.9–105(1)(c) defining "collateral." Under this analysis, Inland was required to file within 10 days of delivering the equipment under the lease. Such an analysis is desirable in that it promotes the policy of requiring filings, thus putting all persons on notice. It may meet a current business practice of routinely filing all lease options, thus eliminating any contention as to priorities and may have a practical application of avoiding lawsuits. Apparently it has no adverse effect upon taxes. However, it has

one disadvantage: that interpretation overlooks another provision of RCW 62A.1–201(37), which specifically states:

> Unless a lease . . . is intended as security, reservation of title thereunder is not a "security interest" . . . (a) that inclusion of an option to purchase does not of itself make the lease one intended for security, . . .

RCW 62A.2–401(1) and RCW 62A.9–113, cited by the dissent, make U.C.C. article 2 security interests subject to the provisions of U.C.C. article 9.[8] Furthermore, RCW 62A.1–201(37) applies to all sections of the code. This very specific exclusion section exempts true leases from the category of "security interests" and could not be clearer. Property subject to a true lease is not subject to a security interest, be it under article 2 or article 9. It is equally clear that "collateral" under RCW 62A.9–105(1)(c) is "property subject to a security interest". Therefore, property subject to a true lease cannot be collateral. Only when some additional triggering event occurs to change the status of the lease to a security interest, can the property become collateral. Only then may the debtor be deemed in possession of that collateral, the event necessary to begin the running of the 10–day period under RCW 62A.9–312(4).

We believe that a proper reading of the statute required that no security interest arose until this purchase agreement was signed by the debtor.[9] *See also* RCW 62A.2–201(1) and RCW 62A.9–203(1). Here, while the lessee-debtor was in possession, there was no collateral until the purchase agreement was executed; then a security interest

---

[8]Article 2 security interests terminate when the debtor is in possession of the "goods" (not "collateral") under RCW 62A.9–113. J. White & R. Summers, *Uniform Commercial Code* 898 (2d ed. 1980).

[9]The dissent argues conversion from lease to purchase occurred when Tonasket orally informed Inland it wished to exercise the option. But the option by its own terms required a writing. And to be enforceable, the exercise of a purchase option requires compliance with RCW 62A.2–201(1) (Formal requirements–statute of frauds) which demands a writing signed by the party to be charged. Before Tonasket signed the conditional sales contract, it was not bound to buy.

was created. The equipment in Tonasket's possession did not become collateral until February 26, when Tonasket signed the purchase agreement; the 10–day period began to run from that date.[10] A financing statement was filed within that time period; if the trial court finds that the lease was a true lease; there was compliance with RCW 62A.9–312(4).

## IV
### LIMITATION OF RECOVERY TO DEBTOR'S EQUITY

■ Lastly, Inland contends the court erred in not limiting Rainier's recovery to Tonasket's equity in the collateral. That is a position held in *International Harvester Credit Corp. v. American Nat'l Bank,* 296 So. 2d 32, 85 A.L.R.3d 1015 (Fla. 1974), but rejected in *General Elec. Credit Corp. v. Tidwell Indus., Inc.,* 115 Ariz. 362, 565 P.2d 868 (1978); and *Whitworth v. Krueger,* 98 Idaho 65, 558 P.2d 1026 (1976). The code does not provide for limiting security interests in after–acquired property to the debtor's equity. The filing provisions of the purchase money security interests are to protect both the previous creditor and the purchase money creditor. As noted in RCW 62A.1–102, one of the underlying purposes and policies of the entire title is to simplify, clarify and modernize the law governing commercial transactions while permitting the continued expansion of commercial practices through custom, usage and agreement of the parties, and to make uniform the law among the various jurisdictions. One who has a purchase money security interest is by statute bound to file that within 10 days or he loses his priority. If he desires his priority, it is

---

[10]Inland's security interest could not be perfected until after the lease was converted to a security interest. However, it would have been permissible for Inland to have filed in this matter when the lease began; perfection then would have occurred when the last step necessary for attachment—here Tonasket's signature—occurred. RCW 62A.9–303(1); *Empire Mach. Co. v. Union Rock & Materials Corp.,* 119 Ariz. 145, 579 P.2d 1115, 1118 (Ct. App. 1978). Such filing would have avoided all need for this complex and expensive litigation, since Inland's priority would have been undisputed.

incumbent upon him to file his financing statement.

Judgment is reversed and the matter remanded for disposition in accordance with this opinion.

Roe, J., concurs.

McInturff, C.J. (dissenting)—As correctly stated by the majority, a security agreement containing an after–acquired property clause was executed by Tonasket in favor of Rainier. The appropriate financing statement was properly filed. Subsequently, Tonasket and Inland executed a rental agreement with option to purchase. Tonasket took possession of the machine in November 1978. On February 5, 1979, Inland signed and mailed a conditional sales contract and security agreement to Tonasket, who signed the documents on February 26, 1979. Inland filed a financing statement on March 5, 1979. The central issue is whether a security interest arises upon possession of goods or upon signature of a security agreement.

I respectfully dissent from the majority opinion for three reasons.

First, in part one, the majority creates an ambiguity in the lease–option agreement where none exists.

The uncontroverted facts are:

1. On November 13, 1978, Tonasket and Inland entered into a lease–option agreement which specified with particularity the terms of a "potential sale". Possession passed to Tonasket and it was obligated to make payments to Inland.

2. The agreement provided that Tonasket had to give written notice of exercise of the option before March 13, 1979.

3. The lease portion of the agreement provided that it converted to a contract March 12, 1979.

4. The only written notice of the exercise of the option contained in the present record is No. 3, above.

5. Tonasket made only one monthly payment under the lease–option agreement, yet a credit memo for two fictitious monthly payments was issued by Inland on February 5,

1979, the date of the contract and security agreement which Inland subsequently assigned to Seattle–First National Bank.

6. The sale price in the lease–option was for a new piece of equipment upon which Tonasket was required to provide insurance coverage.

7. The use tax that was allegedly paid the state for each month's rental before the exercise of the option was credited against the price and applicable sales tax; and

8. The monthly charge for keeping the lease–option operative (which agreement was unquestionably in default after December 13) was 1 percent of the sales price—the highest rate of interest on a purchase allowable at that time (12 percent per annum).

These uncontroverted facts, as a matter of law, describe a financing subterfuge to "create" a down payment to acquire financing for the purchase of the equipment.[11] The face of the machine rental agreement obligated Tonasket to purchase the Caterpillar tractor.

Second, the factors cited by the majority in part two to aid the Superior Court in its determination of whether the lease–option agreement is a disguised security agreement

---

[11]A lease intended as security is a security interest and therefore subject to the code. RCW 62A.1–201(37)(b).

A "lease" is a security interest under the code if the transaction is in reality a sale which the parties clothe in lease terminology. *See Bell v. Itek Leasing Corp.*, 262 Ark. 22, 555 S.W.2d 1, 4 (1977); *United Rental Equip. Co. v. Potts & Callahan Contracting Co.*, 231 Md. 552, 191 A.2d 570, 573 (1963); *U C Leasing, Inc. v. Laughlin*, 96 Nev. 157, 606 P.2d 167, 170 (1980); *In re Jim Wilson, Inc.*, 17 U.C.C. Rep. Serv. 1104, 1106–07 (E.D. Tenn. 1975); *Uniroyal, Inc. v. Michigan Bank, N.A.*, 12 U.C.C. Rep. Serv. 745, 752 (Mich. Cir. Ct. 1972); *In re Dennis Mitchell Indus., Inc.*, 4 U.C.C. Rep. Serv. 1082, 1083–84 (E.D. Pa. 1967).

As stated in *In re Gehrke Enterprises, Inc.*, 28 U.C.C. Rep. Serv. 794, 798 (Bankr. Ct. W.D. Wis. 1979):

the distinction between a true lease and a security lease is that by a true lease the lessor seeks to dispose of the use of the subject property while retaining incidents of ownership and by a security lease the lessor seeks to dispose of most or all of the incidents of ownership of the property, while retaining only sufficient interest in the property to assure payment of the contract obligation. *See also In re Atlanta Times, Inc.*, 259 F. Supp. 820, 826–27 (N.D. Ga. 1966); *In re Wheatland Elec. Prods. Co.*, 237 F. Supp. 820, 822 (W.D. Pa. 1964).

are misleading. The nominal consideration inquiry is inapplicable because the purpose of the lease–option agreement was patently to "create" the down payment required by Inland's bank while at the same time protecting Inland's interest in the equipment. Hence, the trial court's inquiry should be directed to whether, under the lease–option agreement, the lessee has agreed to pay an amount substantially equal to the value of the equipment on which it has the option to become the owner. 1A U.C.C. Serv. § 4A–155 (Bender 1980). That inquiry has already been made and determined adversely to the appellant.

Third, part three of the majority's opinion equates a security interest with a security agreement, thereby assuming at the outset there is no distinction between a security agreement and a security interest. This is in contravention of the distinction between the two recognized in RCW 62A.9–203 and .9–204. In the former section the preexistence of a security interest is assumed because its enforceability arises through possession of the collateral by the secured party, or the execution of a security agreement when the collateral is in possession of the debtor. In .9–204, the security interest's preexistence is assumed, but its attachment to the collateral, as far as enforceability is concerned, does not arise until execution of the agreement. Even though there was no article 9 security agreement without Tonasket's signature, there was an article 2 security interest[12] that arose upon Tonasket's exercise of the

---

[12]RCW 62A.2–401(1) states in part:

*Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.*

The following hypothetical is illustrative:

Calamity strikes during harvest season. A farmer becomes in dire need to purchase a replacement combine. After investigating the market he approaches a local dealer on a Friday afternoon. The dealer is unable to locate the necessary forms to close the transaction but because time is of the essence and because of past dealings with the farmer, he allows him to take possession of the machine

option so as to make the tractor collateral in the possession of a debtor.[13] Retention or reservation of title to goods by a seller, notwithstanding delivery of the goods to the buyer, constitutes the reservation of a security interest. *See also* RCW 62A.1–201(37).

In the instant case, the parties at the time they entered into the lease–option agreement established the parameters of their potential debtor–creditor relationship should Tonasket exercise the option to purchase. Implicit in the majority opinion, Tonasket exercised the option on or immediately before February 5, 1979, the date Inland mailed to Tonasket the contract and security agreement memorializing the terms set forth in the lease–option; then the relationship of the parties changed, *i.e.,* Inland's offer to sell was accepted. At that point in time a sale occurred and title to the equipment passed to Tonasket. The lease represented a retention of "paper title" until a written contract was executed. As such, the lease was indicative of an article 2 security interest that had to be perfected pursuant to article 9. *See* RCW 62A.2–401(1), *supra.* In other words, Tonasket became a debtor–buyer (*see* RCW 62A.2–201(2) and (3)) and the equipment became "collateral" for the resulting inchoate article 2 security interest of Inland recognized by RCW 62A.1–210(37) and RCW 62A.2–401. Hence, Inland under RCW 62A.9–312(4) had only 10 days within which to effectuate its claimed purchase money

with the understanding the written installment sales contract and security agreement will be executed in the near future. Two weeks later the dealer drives to the farmer's home to execute the required documents. Under the majority opinion the combine does not become collateral and the farmer not a debtor in possession until the security agreement is executed. Because this seems illogical, and impractical, I submit that under RCW 62A.2–401(1) the dealer has a valid security interest (albeit unenforceable under article 9) in the combine possessed by the farmer during the 2–week interval; and consequently, if not properly perfected, is subject to loss of priority to any other perfected article 9 security interest.

[13]Additionally, RCW 62A.9–113 states:

"A security interest arising solely under the Article on Sales (Article 2) is subject to the provisions of this Article except . . . [for provisions not applicable here]."

security interest priority. It failed to do so.[14]

The approach taken by the majority hampers the purpose for which RCW 62A.9-101 *et seq.* was promulgated, *i.e.,* to make the process of perfecting a security interest easy, simple and certain—to look to substance rather than form. *See James Talcott, Inc. v. Franklin Nat'l Bank,* 292 Minn. 277, 194 N.W.2d 775 (1972); *North Platte State Bank v. Production Credit Ass'n,* 189 Neb. 44, 200 N.W.2d 1 (1972); *James Talcott, Inc. v. Associates Capital Co.,* 491 F.2d 879 (6th Cir. 1974).

I would, therefore, affirm the Superior Court.

Reconsideration denied August 4, 1981.

Review denied by Supreme Court October 16, 1981.

---

[14]The prime purpose of the Uniform Commercial Code is to require all persons holding a security interest in any property to publicly reveal such interest by filing a short, simple but concise financing statement. To allow one to avoid provisions of the Washington code by devised nomenclature would defeat that purpose.