**In re James E. MITCHELL and Nellie C. Mitchell, Debtors.**

**Bankruptcy No. 83–00404.**

United States Bankruptcy Court, N.D. Alabama.

Nov. 20, 1984.

Joseph Philip Borg, and Virginia L. Martin, Montgomery, Ala., for creditors.

Thomas J. Knight, Anniston, Ala., for debtors.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

The above-styled case was commenced by a voluntary petition under Chapter 11, Title 11, United States Code, filed in the predecessor court, on January 24, 1983, and is still pending under said chapter, in the present court. On November 8, 1983, First Alabama Leasing, Inc. (hereinafter referred to as Leasing), and First Alabama Bank of Montgomery, N.A. (hereinafter referred to as Bank), filed separate motions seeking relief from the stay provided for by 11 U.S.C. § 362(a) and for leave "to recover all its property." The motions also sought to have the Court "order an accounting of all funds received as proceeds of milk sales by debtors." The motions sought, in the alternative, to have the Court "order that debtors immediately bring all leases current and that assignment of milk proceeds be reinstated."

On December 6, 1983, the motions came before the Court for a hearing, at which the debtors and the two creditors were represented by their respective attorneys. At the hearing, the attorneys requested that the Court hold these matters in abeyance, in order for them to pursue a possible settlement or agreement between the debtors and the creditors. At this point, the attorney for the two creditors executed a

written consent that the Court enter an order continuing in force the stay under said § 362, and such an order then was entered by the Court.

On February 23, 1984, the bankruptcy judge was advised by letter from counsel for the creditors that a settlement or agreement could not be reached and that the matter would have to be decided by the Court; whereupon, a continued hearing on .the motions was set for April 3, 1984. The continued hearing was not held, when Leasing and Bank filed a joint motion for "summary judgment" and two affidavits.

The attorney for the two creditors filed a substantial brief, which was answered by a brief on behalf of the debtors, with an affidavit. On June 8, 1984, an attorney for the two creditors filed a rebuttal brief and three affidavits in support of the motion for summary judgment.

Here the matter has rested, as no hearing has ever been scheduled upon the motion for summary judgment, and none has been requested by either the attorney for the debtors or counsel for the two creditors.

By letter dated September 25, 1984, one of the attorneys for Leasing and Bank complained to the Court about the delay in the disposition of this contested matter and requested a ruling by the Court "without further delay." The attorney, by letter received November 5, 1984, repeats her previous complaints and demands an order from the Court within ten days from the date of the letter (November 1, 1984). Having received the reply brief from the attorney for the debtors and in view of the two letters from the attorney for the creditors, the Court concludes that a hearing on the motion for summary judgment is waived by the debtors and by the two creditors. The Court, therefore, will attempt to comply with the demand of the attorney for the creditors, utilizing the pleadings and proof at hand.

As will appear more clearly from the conclusions by the Court, this matter is before the Court essentially upon the motion seeking relief from the stay provided for by 11 U.S.C. § 362(a). The seeking of relief of this type by a motion is in conformity with the provisions of Bankruptcy Rule 4001(a). The effort of the two creditors to obtain by means of a motion the other relief sought, however, does not appear to find any warrant in the Bankruptcy Rules.

■ Although, it may appear anomalous for the moving party to advance the disposition by the Court of the original motion through the filing of a motion for summary judgment, this procedure conforms with the provisions of Bankruptcy Rule 9014, which governs motions in contested matters. This rule provides that,·unless the Court otherwise directs, Bankruptcy Rule 7056 applies. No contrary direction was given by the Court here. Bankruptcy Rule 7056 makes Rule 56, Federal Rules of Civil Procedure, applicable in adversary proceedings. Interpolation makes Rule 56 applicable to this contested matter. Rule 56 contains provisions which permit a party seeking to recover upon a claim to "move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof."

The motion seeking relief from the stay ordinarily requires not just a hearing but an evidentiary hearing because the facts upon which the relief sought will rest do not ordinarily appear of record. It appears that one thrust of the subsequent motion for summary judgment (with which were filed supporting affidavits) was an effort to obtain a ruling by the Court upon the main motion, without the testimony of witnesses being taken orally in open court.

*Findings of Fact*

From the pleadings, affidavits, and concessions of counsel in their briefs the bankruptcy judge finds the following facts:

1. Under a written agreement dated May 5, 1980, Leasing purported to lease to "Mitchell Dairy Farm, A Partnership," one 3,000 gallon milk tank and related equipment for five years, at a "Rental" of $25,-285.20, payable in monthly installments of $421.42;

2.   Under a similar agreement of the same date, Leasing purported to lease sundry dairy equipment at a "Rental" of $35,-297.40, payable in monthly installments of $588.29;

3.   Under a written agreement dated October 8, 1982, Bank purported to lease to "Mitchell Dairy Farm, A Sole Proprietorship," 35 identified "Holstein Heifers" for five years at a "Rental" of $60,598.80, payable in monthly installments of $1,009.98;

4.   The three agreements were executed for "Mitchell Dairy Farm" by James E. Mitchell, identified in each as "Its Owner;"

5.   The first two agreements were accompanied by an "Individual Guaranty Agreement" executed by both debtors and by a third individual, while the last agreement was accompanied by a similar separate guaranty of each debtor;

6.   Each agreement required the so-called "lessee" to bear the expense of sales taxes and all other taxes related to the "equipment" and a stated amount of insurance thereon and to bear all risk of damage or loss to the dairy equipment or injury to or sickness or death of the cattle;

7.   At the end of the term of the first two leases, the agreements gave the so-called "lessee" the right to buy the equipment for its "fair market value," and the same was provided in the third agreement, except that the "offspring" of the original cows were included without further charge by Bank;

8.   The equipment and cattle were, according to the agreements, to be kept in Cherokee County, Alabama, where, apparently, the debtors lived, and Leasing and Bank had places of business in Montgomery, Alabama;

9.   Leasing filed a purported financing statement for the 3,000 gallon milk tank and related equipment in the Office of the Secretary of State of Alabama, on March 2, 1981, and in some unidentified probate judge's office on February 28, 1981, and for the other "Dairy Equipment" in the office of the Secretary of State of Alabama on ?, 1980, and in some unspecified probate judge's office on May 14, 1980;

10.   Purported financing statements with regard to the cattle were filed by Bank with the Secretary of State of Alabama, on November 29, 1982, and in some unidentified probate judge's office on November 2?, 1982;

11.   Each of the three agreements contained provisions which indicated that Leasing or Bank would receive income-tax deductions for depreciation on the equipment or cows and a federal investment tax credit (estimated at 10%) on the property and made the so-called "lessee" the insurer thereof;

12.   The payments provided for by each agreement had been made until the Chapter 11 reorganization case was filed but were in default thereafter;  and

13.   The debtor James Erskine Mitchell stated in his affidavit that Jerry Parker, a vice president of Leasing and an agent of Bank, from the inception of the dealings involved here, informed him that these financing arrangements were structured to obtain certain tax benefits for Leasing and Bank, that they could offer him cheaper financing with a "lease," but that they had no use for dairy equipment or cows, and that he could buy them at an estimated 8% of the original purchase price (no more than 10%) at the end of the contracts;  however, the last statement was denied in the affidavit of Jerry Parker.

*Conclusions by the Court —*

The question of whether agreements such as these are true leases or conditional sales ("security") agreements poses a considerable hazard of error to anyone giving an unequivocal answer—except a final arbiter.   The task of decision is comparable to that of discerning with the naked eye the individual differences between two loaves of packaged bread bearing the same label and description.   Yet, initial appearances indicate that this is the matter to be decided by the Court here.

Counsel thusly say in their briefs. In his main brief counsel for Leasing and Bank states:

> ... Apparently, only a single issue of law is presented, i.e., the characterization of certain leases between First Alabama Bank of Montgomery, N.A. and First Alabama Leasing, Inc. and the Debtors as either true leases or conditional sales contracts. ....

This contention is repeated in the rebuttal brief for Leasing and Bank:

> The sole issue before the Court in this Chapter 11 proceeding is whether the three lease agreements between First Alabama and the Debtors shall be characterized as true leases or Article 9 security interests. ....

In the debtors' reply brief, counsel agrees but adds a "kicker":

> 1. This contested matter turns upon the issue of whether the subject agreement is "a true lease" or a transaction governed by the provisions of Article IX of the Uniform Commercial Code dealing with secured transactions. ... If the Court rules that the transaction is a [sic.] "a secured transaction" the Court will undoubtedly also find at the appropriate time that the security interest attempted by First Alabama in both cases is not perfected and that First Alabama is not entitled to any special or different treatment with regard to the subject property than are the general creditors in this case.

If any of the agreements is a conditional sales contract and therefore a security agreement,[1] it is not enforceable against the debtors in this case,[2] unless "perfected" by the timely and proper filing of a financing statement as provided in the Alabama *Uniform Commercial Code.*[3]

The Alabama *Uniform Commercial Code,* in its definition of the term "[s]ecurity interest," at § 7–1–201(37), deals with the issue presented to the Court here, as follows:

> ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

In each of the contracts covering dairy equipment, the so-called lessee had the option to purchase the equipment, at the end of the term of the lease, for its "fair market value"; therefore, it cannot be said that the lessee could become the owner of the property for no additional consideration or for a nominal consideration. Thus, these agreements are not declared to be leases "intended for security" by virtue of the inclusion in them of the option to purchase. A decision of the true nature of the agreements then falls back upon the direction of the Alabama statute that the nature of the agreement is to be determined by the facts of each case.

In the case of the agreement covering the 35 head of cattle, the situation is different. The principal lease agreement provides for the lessee to have the option to purchase the cattle, at the end of the term of the lease, for their "fair market value," but the agreement which supplements the main lease agreement further provides that the lessee shall also receive the offspring of the original herd of cattle at no additional cost. The Court concludes that the latter provision, taken with the former provi-

---

**1.** " 'Security agreement' means an agreement which creates or provides for a security interest." Code of Alabama (1975), § 7–9–105(1)(h); see Subdivision (1)(*l*), after 1981 amendments. See the definition of "security interest" in § 7–1–201(37).

**2.** 11 U.S.C. §§ 1107(a) and 544(a)(1).

**3.** Code of Alabama (1975), §§ 7–9–301, 7–9–302, 7–9–402, and 7–9–401. See amendments made, with effective dates, by Act of Alabama No. 81–312 (1981); as to effective dates see particularly amended Code § 7–11–101.

sion, brings the so-called lease within the terms of *Alabama Code* (1975), § 7–1–201(37), which provide that if the lessee has an option to become the owner of the property "for no additional consideration or for a nominal consideration" the lease is "one intended for security." These two provisions indicate that a property interest other than one of possession is created in the lessee and that the option to purchase the cattle is for a nominal consideration, when their fair market value is reduced by the value of their offspring.

█ As to the agreements covering the equipment, the Court is unable to conclude from "the facts of each case" that the leases are intended for security. The Court is not at liberty to consider the sworn statement of James Erskine Mitchell that Jerry Parker informed him that he could buy the equipment and the cattle for approximately 10% of their purchase costs at the end of the terms of the agreement. The agreements appear to be complete and reduced to writing. This may also be said, in particular, regarding the purchase option granted to the lessee. In construing the three contracts, the Court is bound by Alabama case law which does not permit proof of a parol variance of a contract fully reduced to writing.[4]

█ Two decisions by the United States Court of Appeals for the Fifth Circuit are cited to the Court, being the 1978 case of *Matter of Tillery*[5] and the 1981 case of *American Standard Credit v. National Cement.*[6] The opinions in these cases discuss in considerable detail the factors to be considered by a court in determining whether a so-called "lease" of tangible personal property is, in fact, a lease or whether it is, in fact, a conditional sales contract (security agreement) for the sale of the property, disguised as a lease.

In the case before the Court, it appears that Leasing and Bank wished to obtain the income tax benefits from deducting depreciation of the property which they placed in the hands of one or both debtors. They also wished to take federal investment tax credits with regard to said property. In order to obtain these benefits, they attempted to structure these financing agreements as true leases. It appears to the Court that they were successful as far as concerns the first two agreements. It appears that little would be gained from an esoteric discussion by the Court of each of the elements considered in the *Tillery* and *American Standard Credit* cases.

█ Leasing is entitled to relief from the stay provided for by 11 U.S.C. § 362(a), particularly Subdivision (3), as to the dairy equipment, and an Order will be entered so providing. This will permit Leasing to pursue whatever legal methods or remedies are open to it for recovery of possession of the dairy equipment. The Order will provide that the stay shall remain in effect as to the Bank and the cattle and that the motion for summary judgment by it is denied.

█ In addition, the motion for summary judgment will not be granted to Leasing in regard to those aspects of the original motion which seek "to recover all its property", to obtain an "order [for] an accounting," or, in the alternative, an "order that debtors immediately bring all leases current and that assignment of milk proceeds be reinstated." The Court knows of no warrant for it to order the debtors to bring the leases current or to reinstate an assignment of milk proceeds, which would be a command to the debtors that they perform the three contracts. Bankruptcy Rule 7001 provides that a proceeding in a bankruptcy court "to recover money or property ..." is an adversary proceeding. Bankruptcy Rule 7003 makes Federal Rule of Civil Procedure 3 applicable in adversary proceedings, and the latter Rule is interpolated to require the filing of a complaint—not a motion to institute a contested matter un-

---

4. *Shepherd Realty v. Winn-Dixie Montgomery,* 418 So.2d 871 (Ala.1982).

5. 571 F.2d 1361 (5th Cir.1978).

6. 643 F.2d 248 (5th Cir.1981).

der Bankruptcy Rule 9014. Bankruptcy Rule 7001 also provides that a proceeding in a bankruptcy court "to obtain ... other equitable relief is an adversary proceeding." A proceeding to obtain an accounting is generally an equitable proceeding.