NORTH PLATTE STATE BANK, A BANKING CORPORATION, APPELLANT, V. PRODUCTION CREDIT ASSOCIATION OF NORTH PLATTE, NEBRASKA, A CORPORATION, APPELLEE.

200 N. W. 2d 1

Filed August 4, 1972. No. 38292.

Murphy, Pederson & Piccolo, for appellant.

Kelley & Wallace, for appellee.

Carl W. Funk, for amicus curiae.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, and CLINTON, JJ., and COLWELL, District Judge.

WHITE, C. J.

This case deals with the priority of secured creditors, each having a perfected security interest in the same collateral. For convenience, the plaintiff-appellant, North Platte State Bank, is hereinafter referred to as Bank, and the defendant-appellee, Production Credit Association of North Platte, is hereinafter referred to as PCA.

In August 1967, Gerald S. Tucker received an "operating loan" from PCA, the loan being subject to annual

renewal in the month of December. A contemporaneously executed security agreement contained an after-acquired property clause which applied PCA's security interest to, inter alia, "all livestock now owned or hereafter acquired by debtor, whether by purchase, natural increase or otherwise." PCA perfected its security interest by properly filing a financing statement which covered "all of the Debtor's livestock," and all subsequent transactions between PCA and Tucker. No other financing statement was filed by PCA.

From November 1967 through January 1968, PCA advanced approximately $70,000 to Tucker, primarily for periodic purchases of cattle. In February 1968, a second security agreement was entered into by Tucker and PCA to cover newly purchased cattle. PCA inspected the Tucker ranch in March and September of 1968 to count the number of head of cattle that had been added by purchase and by natural increase. Still another security agreement was executed by the parties in September to cover the increase in calves.

In October or November of 1968, Tucker approached D. M. Mann, hereinafter referred to as Seller, to purchase certain Angus heifers in the Seller's possession. It should be mentioned that the Seller was merely an agent acting for the true owner of the cattle but this fact has no bearing on a determination in this case. Tucker agreed to purchase as many of the 100 head of cattle as tested pregnant, and the price was $225 per head. The Seller and Tucker agreed that Tucker *was to take delivery of the cattle before January 1, 1969,* but payment and transfer of a bill of sale were to take place after that date. Sometime in November and again in December of 1968, Tucker went to the Bank to discuss opening a line of credit but there was no discussion of a specific loan for any particular purpose.

On November 30, 1968, a trucking company hired by Tucker took 79 head of impregnated Angus heifers from the Seller's ranch and hauled them to the Tucker ranch.

PCA had inspected the Tucker ranch earlier in November, and then in December 1968, PCA made a routine search of the security interest filing records in several counties pursuant to a loan renewal scheduled for December but not formally executed until March 24, 1969. PCA did not see any Angus cattle on the Tucker ranch when it inspected in November, and the December search of the records revealed that only the PCA financing statement of August 1967 was on file.

On January 13, 1969, approximately *a month and a half after he took possession of the cattle,* Tucker drew a check on the Bank for $17,775, the total purchase price for the 79 head of cattle. The Seller, payee of the check, mailed the check to the Bank for deposit. The check was returned for lack of funds, but upon the Seller's inquiry, the Bank acknowledged that a loan to Tucker had been discussed and that if Tucker would come in to complete the necessary papers, the loan would be granted and the check would be honored. Because of weather conditions, Tucker was unable to reach the Bank until January 30, 1969. A note advancing $20,000 to Tucker and a security agreement were executed that day and the next day the Bank honored the check presented by the Seller. Near this point in time, the bill of sale dated January 12, 1969, for the cattle was given to Tucker. On February 5, 1969, the Bank filed a financing statement, thus perfecting a security interest in the 79 head of cattle.

PCA became aware of the presence of the Angus cattle on the Tucker ranch sometime in February 1969. Tucker told PCA that the Angus cattle were purchased with the proceeds of a sale of several calves of another breed. Having checked the records in December 1968, and receiving this explanation for the presence of the Angus cattle, PCA saw to it that a loan renewal note was signed by Tucker and a security agreement including, specifically, the 79 Angus cattle, was executed on March 24, 1969.

In December 1969, unable to locate all of Tucker's cattle in which it had a security interest, PCA checked the filing records and found the Bank's financing statement of February 5, 1969. Late in December 1969, after Tucker defaulted on the PCA note of March 24, 1969, PCA took possession of all the cattle on Tucker's ranch, including the 79 head of Angus cattle. After the Bank claimed priority to the Angus heifers, PCA and the Bank agreed to sell the cattle and to hold the proceeds in escrow pending a determination as to the priority of their respective security interests.

The issue here is which of the secured creditors has priority to the proceeds from the sale of the cattle. The district court held that the first creditor to file a financing statement, PCA, has priority. We affirm the judgment of the district court.

The primary purpose of Article 9 of the Uniform Commercial Code was to simplify and lend certainty to procedures for establishing security interests in goods. The heart of Article 9 is its notice filing system and the fundamental rule therein is that when a conflict exists between security interests in the same collateral and the security interests were perfected by filing, the first in time to file a financing statement has priority. § 9-312 (5) (a), U. C. C. A special category called purchase money security interests was established to give those interests qualifying a special priority. § 9-312 (3) and (4), U. C. C. In this case, both security interests were perfected by filing so that unless subsections (3) or (4) of section 9-312, U. C. C., apply, under section 9-312 (5) (a), U. C. C., the first creditor, PCA, being the first to file, has priority. The second creditor, the Bank, claims that section 9-312 (4), U. C. C., does in fact apply and that, therefore, the second creditor has priority.

There are two basic questions presented in this case. As we see it, the resolution of either one of these questions will be decisive in the case. The first question is whether the Bank did in fact under the pertinent pro-

visions of the Code have a purchase money security interest in the collateral? The second question is that, if it did have a purchase money security interest in the collateral, did it acquire priority under section 9-312 (4), U. C. C.?

Did the Bank have a purchase money security interest?

A purchase money security interest is defined in section 9-107, U. C. C. It states:

"A security interest is a 'purchase money security interest' to the extent that it is

"(a) taken or retained by the seller of the collateral to secure all or part of its price; or

"(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

Tucker and the Seller (agent for Long) made an oral contract for sale sometime in November 1968. Later when the 79 pregnant cows were identified, they were finally delivered to Tucker on November 30, 1968. It is apparent, therefore, that the actual goods contracted for were delivered to the buyer under the previous contract for sale; that Tucker physically received them; and that they were therefore in his legal possession. The ordinary understanding of the term "possession" means that a person has possession when he has physical control of the property. Boyd v. Travelers Fire Ins. Co., 147 Neb. 237, 22 N. W. 2d 700. The only further question to be determined here is whether the actual physical delivery of the cows and their acceptance by Tucker, the buyer, was affected by the fact that the payment of the price and the delivery of the bill of sale were postponed. It is true that delivery by a seller under a contract for sale can take place prior to the receipt of the goods by the buyer. Receipt is defined by section 2-103 (1) (c), U. C. C., as taking physical possession. It is clear that the tender of delivery by the Seller for Long took place here under section 2-503 (1), U. C. C.,

and the buyer received and accepted the goods on arrival at his ranch. It is not argued and indeed, it could not be argued, that the postponement of payment and the later delivery of the bill of sale had any effect upon the time that Tucker received legal possession of the goods. The buyer had received the goods under the precise terms of the Code and this receipt was evidenced by his taking of the actual physical possession. It seems quite obvious that when the cows were delivered to Tucker under the contract for sale and were actually physically received by him, they were in his legal possession and we so hold.

We turn now to the question of whether Tucker on November 30, 1968, acquired more rights in the cows than their possession. It appears from the evidence in this case that Tucker acquired title to the cows as well on November 30, 1968. There is considerable colloquy about the understanding of the parties and particularly about the testimony of the Seller, Long's agent, about what he relied upon in delivering the cows, and what he would have done had the cows not been paid for. What is important is that the Seller said Tucker's word was good enough for him. All of the indications of the oral testimony are that the Seller was relying on Tucker's willingness and ability to make payment of the price and that he was making a sale on open credit. Neither Seller nor Long made any effort to reclaim the goods under section 2-702, U. C. C., granting an unpaid seller on open account the right to reclaim the goods if he discovers his buyer's insolvency. This right must be exercised within 10 days, it was not so exercised, nor did the Seller nor Long know until long after November 30, 1968, that Tucker had become insolvent.

Whatever the parties may have thought, the provisions of the Uniform Commercial Code govern, and it is clear that title to the cows actually passed to Tucker when they reached his ranch and he received the actual physical possession of them. Section 2-401 (2), U. C. C.,

says that unless otherwise *explicitly* agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest. There is no evidence that the sales agreement, either expressly or impliedly, contained an *explicit* provision or term reserving the title until payment had actually been accomplished. We therefore come to the conclusion that after November 30, 1968, once the cattle reached Tucker's ranch and came into his physical possession, under the completely oral transaction the Seller had no enforceable security interest in them and no other interest of any kind. Title and possession were merged in Tucker, it was an unsecured credit transaction, and no cause of action existed against Tucker except one for the agreed price of the cattle under the terms of the agreement.

What, then, was the nature of the Bank's security interest? We pause to observe that at the moment the cattle reached Tucker's ranch, PCA's perfected security interest immediately attached to the 79 cows. All of the conditions necessary had been met; there was a written security agreement with an after-acquired property clause containing a description sufficiently broad to include the cows, value had been given in the form of the original loan, and subsequent extensions of credit which had been renewed a number of times. As we have seen, Tucker had acquired both possession and title to the cows. At the time of delivery and possession of title to Tucker, on November 30, 1968, the financing statement of PCA was the only financing statement on file.

As we have pointed out, section 9-107 (b), U. C. C., provides that a security interest cannot become a purchase money security interest unless it is taken by a person who by making advances or incurring an obligation gives value to enable the debtor *to acquire rights in or the use of collateral* if such value is in fact so used.

Clearly, the Bank could not qualify as the seller of the 79 cows. Obviously, by advancing the $20,000 and taking the mortgage it did acquire a security interest in the cows. The distinction is vital to the disposition of this case. The money advanced by the Bank enabled Tucker to pay the price to Seller for the cows. But it was not used by Tucker to acquire any rights in the cows because he already had all the possible rights in the cows he could have with both possession and title.

There is a further and even more fundamental reason why the Bank may not succeed in establishing any priority over PCA in the enforcement of its security interest. This is because that although it filed its statement within 10 days after it made its loan, the filing occurred almost 2 months after the cows had been delivered and the title had passed to Tucker. At the risk of repetition, we will repeat the basic portion of section 9-312 (4), U. C. C., which states: "* * * if the purchase money security interest is perfected at the time the *debtor* receives possession of the collateral or within ten days thereafter." (Emphasis supplied.) The application of this plain, simple, and forceful language to the facts in the case at bar seem so obvious as not to require any further argument. However, the Bank argues at length and persistently that Tucker did not become a "debtor" within the meaning of section 9-312 (4), U. C. C., until the money was loaned by the Bank and that, therefore, "debtor" Tucker never had full "possession of the collateral" in the section 9-312 (4), U. C. C., sense until the loan was made by the Bank and the security agreement signed. Therefore, the Bank argues that since it filed a financing statement within 10 days after the execution of the security agreement with Tucker, it qualifies for the special priority of section 9-312 (4), U. C. C.

Manifestly, on January 30, 1969, when the Bank executed the loan, Tucker was a "debtor" of both the Bank and PCA. Section 9-105 (1) (d), U. C. C., pro-

vides that unless the context otherwise requires a "debtor" is "the person who owes payment or other performance of the obligations secured, whether or not he owns or has rights in the collateral * * *." Tucker did not or could not receive possession from the Bank and it is uncontrovertible that he became a "debtor" to the Seller on November 30, 1968. While Tucker may not have been the Bank's "debtor" until January 30, 1969, it is inescapable in the context of the Code that he was the "debtor" in the section 9-312 (4), U. C. C., sense when he became a "debtor" to PCA. On November 30, 1968, the time and the only time that he "received" possession, Tucker was a "debtor" of PCA and Seller only. To hold otherwise renders the language of the statute meaningless, and purports a construction wholly unrelated to setting up an ascertainable time standard by which priorities may be established so that a subsequent lender can achieve priority over the first to file. This interpretation is well stated in 2 Coogan, Hogan & Vagts, Secured Transactions Under the Uniform Commercial Code, section 19.02 (3) (a), p. 1979, wherein it is stated: "The time at which the debtor receives possession *starts the running* of the ten-day grace period for perfection. Problems will undoubtedly arise as to when the debtor 'receives possession' of the collateral. The Code does not offer a specific definition of the term, but there are indications that actual delivery to the buyer or to a third party is crucial. *It is important to realize that this priority rule turns on the more easily ascertained time of receipt of possession and not upon the time the debtor obtains 'rights' in the collateral.*" (Emphasis supplied.)

The very purpose of the 10-day grace period was to relieve from the rigidity of a requirement of a loan first and acquisition second or simultaneousness of receipt of possession and execution of the loan. At the same time the integrity of the transaction had to be guaranteed by an ascertainable standard related to the re-

ceipt of possession, and the retroactive granting of priority over the first to file and the first to advance funds. See II Gilmore, Security Interests in Personal Property, § 29.2, p. 782.

We observe that the 10-day grace period in itself allows for a permissible flexibility in the practical aspects of consummating a purchase money transaction. By their nature grace periods must have a fixed time limit, or they become meaningless. We cannot extend judicially another grace period over the Code grace period. We cannot pile flexibility upon flexibility. The purchase money priority is an exception to the first to file rule, and it should be applied only in accordance with the limitations established by the Code. To interpret section 9-312 (4), U. C. C., in the manner the Bank urges would not only be contrary to the plain meaning of the language used in the statute but would expose an original lender to such serious practical risks that the whole structure of the Code would be impaired or endangered, because the original lender could never feel sure that he could rely on his collateral in his future dealings with the debtor. We point out our holding herein is consistent with the Code provision that when inventory is involved, anyone with a purchase money security interest who seeks to escape from the first to file rule must not only perfect his security interest *before* the debtor receives possession of the collateral but must also, before possession is received by the debtor, give notice to the original security holder concerning the financing the purchase money security holder is about to undertake. We point out further that the grace period, although adequate to encompass the practicalities of the ordinary financing transaction, must necessarily be brief because of the possibility the original first to file lender may make additional advances relying upon the existence and the possession of after-acquired property by the borrower. It is clear that to hold otherwise would permit a subsequent lender 2

months later, 6 months later, or perhaps a year later, to convert an unsecured credit transaction into a first lien taking priority of the first to file lendor who had advanced substantial sums on the basis of the acquisition and the possession of the same property to which priority is sought to be attached.

The Bank relies almost completely on the decision of the Court of Appeals in Brodie Hotel Supply, Inc. v. United States, 431 F. 2d 1316 (9th Cir., 1970). There are two answers to this contention, besides the analysis and the decision we have reached on the merits. In the first place, the Brodie case is inapposite on the facts. The court reached the correct decision in the Brodie case because the purchase money security holder in fact perfected his filing within 10 days after Lyon, the purchaser, obtained possession of the equipment and thereby achieved priority over the lender. The language and the reasoning of the Brodie case, however, relied upon by the Bank have been seriously criticized. For a full discussion of this case, see 27 The Business Lawyer, Kennedy, Secured Transactions, 755 at p. 768 (1972); and Comment, 49 No. C. L. Rev. 849 (1971).

We conclude with this particularly appropriate statement taken from the recent case of James Talcott, Inc. v. Franklin National Bank of Minneapolis (Minn.), 194 N. W. 2d 775: "The fundamental purpose of Art. 9 of the code is to make the process of perfecting a security interest easy, simple, and certain. It was intended to be a complete reversal of prior chattel security law and to rid the unaware of the traps of requirement of specific types of acknowledgements, technical affidavits of consideration, selection of specific proper forms, and other pitfalls that were not uncommon. The code very simply and briefly provides for a notice-filing procedure with a minimum of information required to be publicized in a filed financing statement. All that is required is a minimal description, and it may be by type or kind. The statement need not necessarily contain de-

tail as to collateral, nor any statement of quantity, size, description or specifications, or serial numbers. No preciseness is required with respect to whether the collateral exists at the time of filing or is to be acquired thereafter, and no statement of charges, payment schedule, or maturity date need be included in the statement. The first to file shall prevail. Although there are a few exceptions, *they are very clearly and definitely stated.*" (Emphasis supplied.)

We therefore hold in this case that the Bank failed to comply with the requirements of section 9-312 (4), U. C. C., because it did not file a financing statement until more than 10 days had passed from the time the cattle came into the "debtor" Tucker's possession. Therefore, the first to file rule of section 9-312 (5) (a), U. C. C., applies, and the original priority of PCA controls.

The judgment of the district court is correct and is affirmed.

AFFIRMED.