**In re Bobby Lee DANIELS, a/k/a Bob L. Daniels, and Shirley Rose Daniels, d/b/a Daniels Marine, Debtors.**

**ITT DIVERSIFIED CREDIT CORPORATION, a Delaware corporation, Plaintiff,**

v.

**Bob L. DANIELS, d/b/a Daniels Marine, an individual; Daniels Marine, Inc., an Oklahoma corporation, Defendants.**

**Bankruptcy No. 81–01584.
Adv. No. 82–0431.**

United States Bankruptcy Court, W.D. Oklahoma.

Nov. 29, 1983.

Carl W. Parkhurst of Hackler & Parkhurst, McAlester, Okl., for American Bank of Commerce.

Edward O. Lee of Pate & Payne, Oklahoma City, Okl., for ITT Diversified Credit Corp.

Robert L. Dennis, Oklahoma City, Okl., for Small Business Administration.

MEMORANDUM DECISION
AND ORDER

RICHARD L. BOHANON, Bankruptcy Judge.

The matter for determination arises from a motion made by ITT Diversified Credit Corporation for a decision as to its priority status regarding conflicting security interests. The matter has been fully briefed by all parties and the facts are not controverted. Due to a thorough stipulation of facts there remains only the sole question of whether a letter of notification sent by American Bank of Commerce to ITT complied with 12A O.S.1981 § 9–312.

In January, 1982 the debtor entered into two wholesale financing and security agreements with ITT Diversified Credit Corporation for the purpose of purchasing boats, motors and related accessories for his business operation known as Daniels Marine, Inc. ITT was granted a security interest in several items listed as exhibits and made a part of the record. ITT properly perfected its security interest in these items by filing the necessary financing statements.

The Small Business Administration through the American Bank of Commerce subsequently loaned Daniels Marine, Inc., certain sums of money and in return was granted a security interest in the inventory and equipment. In July, 1981 the American Bank of Commerce forwarded to all known creditors of Daniels Marine, Inc., a letter regarding their security interest in said inventory and equipment. That letter provides in pertinent part:

Gentleman:

The American Bank of Commerce has taken, or plans to take a *security interest* in the following equipment located at the customers place of business at Longtown, Oklahoma, mailing address Highway # 9, Eufaula, Oklahoma: All machinery & equipment; *inventory;* accounts receivable; automotive equipment, furniture & fixtures *now owned or hereafter acquired;* All Used boats and motors *now owned or hereafter acquired* including but not limited to: [listing numerous items with specific descriptions and serial numbers]. (emphasis added)

/s/ John Freeman

ITT admits that it received the subject letter and raises no question regarding time of receipt, description of the collateral or other points beyond the issue raised by this proceeding.

In April of 1982, pursuant to an order of this Court, the Small Business Administration conducted a foreclosure sale of property in which it claimed a security interest pursuant to agreements with the debtor as previously set forth. Among the property sold at the foreclosure sale were certain items in which both ITT and the Small Business Administration, through the American Bank of Commerce, claimed a security interest.

This proceeding raises a novel and interesting question regarding the perfection of a purchase money security interest in inventory and is a case of first impression. We are asked to decide the priority among conflicting security interests in the same collateral. Our inquiry begins with the Uniform Commercial Code and Oklahoma's adoption of the 1972 amendments to the pertinent section, 12A O.S.1981 § 9–312:

(3) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if:

(a) the purchase money security interest is perfected at the time the debtor receives possession of the inventory; and

(b) *the purchase money secured party gives notification in writing to the holder of the conflicting security interest,* if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, or (ii) before the beginning of the twenty-one day period where the purchase money security interest is temporarily perfected without filing or possession (subsection (5) of Section 9–304); and

(c) the holder of the conflicting security interest receives the notification within five (5) years before the debtor receives possession of the inventory; and

(d) the *notification states that the person giving the notice has or expects to acquire a purchase money security interest* in inventory of the debtor, describing such inventory by item or type. (emphasis added)

In the instant case the notification letter from American Bank of Commerce to ITT did not literally track the specific language of 12A O.S.1981 § 9–312(3)(d) in that it only states "[the bank] has taken, or plans to take, a *security interest* . . ." and makes no mention of a *"purchase money security interest."* ITT urges that failure of the bank to state the taking of a *purchase money security interest* in the notification is insufficient to meet the standards prescribed by law, and therefore the bank may not be afforded priority status which it otherwise would acquire. On the other

hand, the bank argues the letter was sufficient to put ITT on notice even though it did not contain the words "purchase money" since there could have been no other reason for sending the notice nor did the letter contain any misleading information.

The 1962 version of the Uniform Commercial Code left several interpretive difficulties, many of which were mooted by amendments in the 1972 version. This was particularly true of Article 9 concerning secured transactions and purchase money security interests in inventory under 9–312. Although several clarifying amendments were made to 9–312, the subsection dealing with the content of the notification remained virtually unchanged. Consequently, cases decided under the 1962 version with respect to the wording of the notification itself may still be good law.

An often cited case concerning section 9–312 is *GAC Credit Corporation v. Small Business Administration,* 323 F.Supp. 795 (D.W.D.Mo.1971). Although this case primarily dealt with whether the notification given a prior secured creditor had to be in writing, the decision can be instructive for our purposes here. In *GAC Credit Corporation* a telephone conversation between the inventory financer and the holder of a prior perfected secured party was held to be sufficient notification. The inventory financer verbally stated to the prior secured party that he intended to "floor plan" certain "RCA merchandise" for the debtor on a "secured money interest." *Id* at 797. The specific language "purchase money security interest" was evidently never uttered, yet the Court found that 9–312 had been substantially complied with, albeit verbally as permitted under the 1962 version. This case would appear to vitiate a strict literal reading of the notification provision found at 9–312.

Other cases infer an opposite viewpoint and appear to suggest that the notification is insufficient if it is not in proper form. For example, in *Manufacturers Acceptance Corporation v. Penning's Sales, Inc.,* 5 Wash.App. 501, 487 P.2d 1053 (1971), the court again had at issue the priority of conflicting interests in inventory. There the prior secured party argued that the inventory financer's interest was inferior for failure to comply with 9–312. The court agreed there was no evidence of compliance and stated "the holder of the purchase money security interest must notify in *proper form* any secured party...." *Id.* 487 P.2d at 1058. (emphasis added). Since no notice was sent at all it is difficult to ascertain whether the court's reference to "proper form" pertained to description of the inventory or the specific language of 9–312. Similar language was used in other cases, but the reference is equally ambiguous. *See Fan-Gil Corporation v. American Hospital Supply Corporation,* 49 Mich.App. 106, 211 N.W.2d 561 (1973); *North Platte State Bank v. Production Credit Association of North Platte,* 189 Neb. 44, 200 N.W.2d 1 (1972); *National Bank and Trust Company of South Bend v. Moody Ford, Inc.,* 149 Ind.App. 479, 273 N.E.2d 757 (1974); *Sears, Roebuck & Company v. Detroit Federal Savings and Loan Association,* 79 Mich.App. 378, 262 N.W.2d 831 (1977). Each of these cases leave sufficient doubt as to their language regarding the necessity of the wording "purchase money security interest" as to be not controlling here. We feel the question deserves a more direct analysis and proceed to do so.

Some recognition must be given to the policy and commercial reasons why purchase money security interest receive special priority. The drafters of the Code realized the impact upon commercial flow which would result should a debtor be strangled by a prior secured creditor. Such a creditor by not providing additional funds could cripple a debtor's commercial operation. The debtor, on the other hand, would be hamstrung in receiving other financing since another creditor would have no collateral protection. The purchase money security interest rescued the debtor from this commercial impasse. In their treatise, *Handbook On The Uniform Commercial Code,* the authors explained this policy rationale:

[T]he debtor needs some protection from a creditor who has filed a financing statement with respect to his goods, but who is unwilling to advance additional funds. If such a debtor can find a lender willing to finance a new line of merchandise, the purchase money provisions enable him to give that new lender a first claim on the new merchandise notwithstanding a prior filing by another creditor. Thus, the purchase money provisions give the debtor somewhat greater bargaining power and at least theoretically enlarge his ability to get credit.

J. White & R. Summers, *Handbook On The Uniform Commercial Code,* § 25–5 at 1043 (2d ed. 1980).

Consequently, there is a strong policy statement which supports the operation of the purchase money interest which should not be interrupted for the sake of mere technical conformity. Moreover, it is generally accepted that the UCC provisions should be liberally construed in order to promote the underlying policies and purposes of the Code. *Compare* 12A O.S.1981 § 1–102 (liberal construction to permit commercial expansion). Conversely, we are unable to identify any policy or purpose which would be served by a literalist statutory reading of 12A O.S.1981 § 9–312.

As for the specific notification provisions of 9–312, resort must be made to the reasons for its mechanics. These are best explained by the draftsmen's comments to the 1972 official text:

The reason for the additional requirement of notification is that typically the arrangement between an inventory secured party and his debtor will require the secured party to make periodic advances against incoming inventory or periodic releases of old inventory as new inventory is received. A fraudulent debtor may apply to the secured party for advances even though he has already given a security interest in the inventory to another secured party. The notification requirement protects the inventory financer in such a situation: if he has received notification, he will presumably not make an advance; if he has not received notification (or if the other interest does not qualify as a purchase money interest) any advance he may make will have priority. Since an arrangement for periodic advances against incoming property is unusual outside the inventory field, no notification requirement is included in subsection (4).

*See* U.C.C. Report. Serv. (Callaghan) § 9–312 at 167 (1977) (citing UCC Art. 9 Draftsman's Comment To 1972 Official Text).

■ It is clear from these comments that the notice provision was for the protection of the prior secured creditor. The first creditor would be alerted not to make further advances since another inventory financer could usurp his prior secured position. If this written notice requirement is essentially accomplished the linguistical technique of how it is accomplished becomes of little importance. Indeed the drafters of section 9–312 specifically directs the reader to the definitional cross references of "give notice" and "knowledge" found in section 1–201. These sections clearly provide that:

(25) A person has "notice" of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) *from all the facts and circumstances known to him at the time in question* he has reason to know that it exist

(26) A person "notifies" or "gives" a notice or notification to another by *taking such steps as may be reasonably required to inform* the other in ordinary course whether or not such other actually comes to know of it. (emphasis added)

■ We do not feel that the reference to the section 1–201 definitions in 9–312 are to be discarded as mere surplusage. Rather, we think these definitional terms are to be equally applied to 9–312 when the circumstances so demand in order to promote the underlying policies of the UCC. We think this is one such circumstance. Here we are not dealing with simply garden variety consumers untrained in the commercial world. These parties are sophisticated commercial

entities in the business of commercial lending and financing. The letter received by ITT, although not containing the magic words "purchase money", did contain terms which clearly indicate a purchase money interest. The use of the terms "furniture or fixtures now owned or hereafter acquired" and "boats and motors now owned or hereafter acquired" should be clear indicators to a sophisticated commercial entity that a purchase money transaction is at hand. This conclusion is buttressed by the fact that in no other situation excepting a purchase money interest is another creditor required to forward any notice to the prior secured party. This is not to say that as a matter of commercial courtesy or for communication purposes creditors may not provide such notices to each other. However, such practices should not confuse the issue at hand in view of the totality of circumstances which exist here.

In light of what we have stated we do not see how ITT could have been misled or confused by the notification letter not having stated "purchase money" among its terms. To reach any other conclusion would be contrary to reason and militate against the very policy of having purchase money security transactions. Moreover, a literal reading of 9–312 while serving no policy interest or purpose would ignore the referenced definitional terms of notice and the liberal construction of the Code. Therefore, in light of all the facts and circumstances known to ITT we find the absence of the terms "purchase money" in the notice forwarded to ITT to be deminimus. However, we feel that our conclusion and holding necessarily must be limited to the facts of this particular case.

Accordingly, for all the above cited reasons we hold that pursuant to the purchase money security interest in the debtor's inventory that the American Bank of Commerce obtained priority secured status;

Further, that the American Bank of Commerce and the Small Business Administration are entitled to the proceeds of the sale of the debtor's inventory items;

Further, that the motion of ITT to determine priority status be and hereby, is denied.