# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1445

_____

| | | |
|---|---|---|
| Platte Valley Bank, a Nebraska State Bank, | * * * | |
| Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Nebraska. |
| Tetra Financial Group, LLC, a Utah Limited Liability Company; Republic Bank, Inc., a Utah Corporation, | * * * * | |
| Appellees. | * | |

_____

Submitted: January 11, 2012
Filed: June 26, 2012

_____

Before RILEY, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

Platte Valley Bank (PVB), a Nebraska banking corporation, claimed a perfected security interest in certain equipment owned by Heggem Construction, Inc. (Heggem), a Wyoming corporation with its principal place of business in Scotts Bluff County, Nebraska. In late 2008, Heggem sold the equipment in a sale and leaseback transaction to Tetra Financial Group, LLC (Tetra), a Utah limited liability company whose members are all domiciliaries of Utah. Tetra later transferred the equipment to Republic Bank, Inc. (Republic, and with Tetra, appellees), a Utah corporation. PVB

sued appellees, claiming appellees converted the equipment and the collateral proceeds of the sale. The district court[1] denied PVB's motion for summary judgment and granted appellees summary judgment, finding the undisputed facts in the record did not support PVB's conversion claims. PVB appeals, and we affirm.

## I.  BACKGROUND

Heggem, a longtime customer of PVB, owed the bank more than $1,000,000. To secure the payment of that debt, Heggem executed a commercial security agreement on March 13, 2002, granting PVB a security interest in all of Heggem's "Property," as described in the security agreement, including "Instruments," "Equipment," and "Deposit Accounts," as well as "all proceeds." The agreement defined equipment to include "machinery" and "vehicles," as well as many other types of equipment, parts, and tools.

On May 6, 2002, PVB filed a financing statement in the office of the Secretary of State for the State of Wyoming to perfect its security interest. On April 18, 2007, PVB filed a continuation statement to keep the financing statement effective.

In late 2007, Heggem and Tetra began discussing the possibility of Tetra providing Heggem lease financing. Tetra and Heggem agreed to structure the transaction as a sale and leaseback agreement under which Heggem would sell some of its construction equipment to Tetra and lease it back for continued use in its construction business. To alleviate Tetra's concerns about the added risk of the longer lease term and lower payments Heggem sought, Heggem suggested placing the purchase funds in a certificate of deposit (CD) as security for the transaction. The suggested structure would allow Heggem to increase its bonding capacity by moving "booked assets to an operating lease and onto a CD."

---

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

Tetra later advised Heggem the security deposit would be placed in a ban control account—held in Heggem's name with Heggem bearing the interest—rather than a CD. Tetra explained the revised structure would allow Tetra to perfect its interest and better protect itself in the event of Heggem's default. As the transaction moved forward, Tetra asked Heggem for credit references. Heggem identified PVB as a creditor, and PVB advised Tetra that Heggem was in good standing on its financial obligations to PVB.

In October 2008, Tetra sent Heggem a draft of the transaction documents, including a subordination agreement for PVB to execute that would have subordinated PVB's security interest in the equipment to Tetra's interest. The parties disagree as to whether PVB was aware of the subordination agreement and was asked to execute it, but agree PVB never signed the agreement.

In late December 2008, Heggem and Tetra executed a Sale and Leaseback Agreement (SLA) dated and effective October 2, 2008, under which Tetra purchased twenty-two pieces of equipment subject to PVB's security interest and then leased the equipment back to Heggem.[2] The SLA provided for a purchase price of $565,430 (holdback amount), which Tetra would hold back to be "used as a security deposit pursuant to [the] Security Agreement" between Heggem and Tetra until Heggem satisfied its lease obligations. The holdback amount was to be held "in an interest bearing account at Republic Bank" for the duration of the base lease term. The SLA did not provide further details about the account.

---

[2] The equipment included five Mack trucks and a flatbed trailer that were titled in Wyoming, which requires a notation on the certificate of title to perfect a security interest. See Neb. U.C.C. §§ 9-303, 9-311; Wyo. Stat. Ann. § 31-2-801(a)(ii). Both parties assert a security interest in the titled equipment, and dispute the priority of their respective interests. Appellees have not asserted a counterclaim for the amounts PVB recovered selling the titled equipment and the parties' dispute does not affect our disposition of this appeal.

In connection with the SLA, Heggem and Tetra also executed a Bill of Sale, Master Lease Agreement (lease), and Lease Schedule No. 1 (lease schedule). Under the terms of the lease, Heggem leased the equipment from Tetra for 60 months with a base monthly rental payment of $11,591.32. The lease schedule stated 100% of the $565,430 total lease cost for the equipment was "to be held in an instrument acceptable to [Tetra] at Republic Bank." Heggem granted Tetra a security interest in the $565,430 security deposit and all Heggem's assets. In the lease schedule, Tetra expressly acknowledged its security interest in Heggem's assets was "junior in priority" to PVB's security interest in those assets.

The sale and leaseback transaction documents did not otherwise recognize PVB's security interest in Heggem's equipment. The SLA and the bill of sale indicated Heggem was transferring good title to the equipment "free and clear of all liens, charges, encumbrances, security interests and rights of others, and that [Heggem] has full right, power and lawful authority to sell said property." (Bill of Sale). Under the terms of the lease, Heggem retained physical possession of the equipment.

After completing the sale and leaseback, Tetra and Republic entered into a Sale and Assignment Agreement (SAA) dated as of December 31, 2008, under which Tetra sold the Heggem equipment to Republic and assigned the lease in exchange for $555,899. At the end of the lease, if Republic had received all of the rental payments due, all of Republic's right, title, and interest in the Heggem equipment would automatically transfer back to Tetra for no additional consideration. Like the sale and leaseback documents, the SAA did not mention PVB's security interest in the equipment. Tetra represented it held "a first lien and priority security interest in the [Heggem equipment]" and purportedly transferred the equipment "free and clear of all liens, charges, encumbrances and other agreements other than the [l]ease and any applicable software license."

The SAA contemplated Republic paying Tetra the $555,899 purchase price in cash on the closing date of January 2, 2009. Instead, at closing, Republic transferred $555,899 of its own funds into a new account titled "Republic Bank BAN CONTROL ACCOUNT Heggem Construction, Inc." (holdback account). Tetra transferred $9,531 into the holdback account, bringing the balance to $565,430. Although Heggem's taxpayer identification number was assigned to the account, Heggem did not sign any of the documents to open the account and did not have the right or ability to withdraw funds from it. The holdback account was in the control and possession of Republic at all times.

Just three months after executing the sale and leaseback transaction, Heggem failed to make the required lease payment for March 2009. Heggem was unable to cure its default. On June 10, 2009, Republic applied the funds in the holdback account to Heggem's lease obligations, "thereby netting out the asset and liability of the [l]ease on Republic Bank's books to zero."[3]

Heggem also fell behind on its payments to PVB. By June 2009, PVB and Heggem began discussing the possibility of selling some of Heggem's assets to provide cash to bring PVB's loan current.

On June 29, 2009, an attorney for PVB sent appellees a letter claiming a security interest in the Heggem equipment and the proceeds being held in the holdback account at Republic. Receiving no response, PVB sent a second letter on September 1, 2009, requesting appellees pay PVB the holdback amount. On October 13, 2009, Tetra's counsel responded by letter, denying PVB or Heggem had any interest in the $565,430 security deposit.

---

[3]We join the district court in interpreting the references in the record to June 10, 2010, to be typographical errors referring to the events occurring on June 10, 2009.

In January 2010, PVB filed suit against appellees in state court in Nebraska, alleging conversion. After filing suit, PVB, with Heggem's cooperation, repossessed and sold the equipment pursuant to PVB's rights as a secured party under Revised Article 9 of the Uniform Commercial Code (U.C.C.) to pay down Heggem's debt to PVB. Neither Tetra nor Republic interfered with PVB's repossession and sale of the equipment. PVB applied the sale proceeds from the untitled equipment to Heggem's outstanding obligations and is holding the sale proceeds from the titled equipment in escrow pending resolution of this litigation.

On February 10, 2010, appellees removed this case to the federal district court pursuant to 28 U.S.C. §§ 1332(a)(1), 1441(a), and 1446, asserting diversity jurisdiction. On May 13, 2010, PVB filed an amended complaint in the district court, alleging appellees converted the equipment and the collateral proceeds acquired upon the equipment's sale. After discovery, PVB and appellees filed cross motions for summary judgment. The district court granted appellees' motion for summary judgment and denied PVB's motion, finding (1) any interference with PVB's rights in the equipment was not serious or important enough to constitute conversion, and (2) appellees had a superior interest in the alleged collateral proceeds. PVB appeals.

## II.  DISCUSSION
### A.    Standard of Review

We review the district court's resolution of cross motions for "summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

-6-

**B.     Choice of Law**

The district court identified a potential choice-of-law issue with respect to whether it should apply Nebraska, Utah, or Wyoming law based on the location of the equipment and the domicile of the parties.  A federal court sitting in diversity generally applies the substantive law of the state in which it sits, see Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), including the rules governing the choice of law. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Under Nebraska law, "[t]he first step in a conflict-of-law analysis is to determine whether there is an actual conflict between the legal rules of different states."  Christian v. Smith, 759 N.W.2d 447, 458 (Neb. 2008); accord Phillips v. Marist Soc. of Washington Province, 80 F.3d 274, 276 (8th Cir. 1996) (advising "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." (quoting Barron v. Ford Motor Co. of Canada, 965 F.2d 195, 197 (7th Cir. 1992) (internal quotation marks omitted))).

The district court found "no substantive difference between the applicable laws of Nebraska, Utah, and Wyoming regarding the issues of this case" because "[a]ll three states define conversion in a similar manner, and all three states have adopted the revised Article 9 of the Uniform Commercial Code."  The parties do not challenge this ruling, and we do not discern any error in the district court's determination.  Because there is no substantive difference between the laws of the contact states, we apply the law of Nebraska, the forum state.  See Yoder v. Cotton, 758 N.W.2d 630, 634-35 (Neb. 2008) (applying Nebraska law in the absence of a conflict in the law of the contact states); accord Phillips, 80 F.3d at 276 (noting, absent a true conflict, the law of the forum controls).

**C.     Equipment**

PVB claims a security interest in Heggem's equipment to secure Heggem's obligations to PVB.  According to PVB, appellees converted PVB's collateral by

exercising "dominion and control over it that was inconsistent with the rights of PVB as a secured party."[4]

Under U.C.C. § 9-315(a)(1), "a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest." See Neb. U.C.C. § 9-315(a)(1)(A); Wyo. Stat. Ann. § 34.1-9-315(a)(i). "[W]hen property is subject to a security interest, an exercise of dominion or control over the property that is inconsistent with the rights of the secured party constitutes, as to that secured party, a conversion of the property." Battle Creek State Bank v. Preusker, 571 N.W.2d 294, 300-01 (Neb. 1997).

> The "tort of conversion has been confined to those major interferences with the chattel, or with the plaintiff's rights in it, which are so serious, and so important, as to justify the forced judicial sale to the defendant which is the distinguishing feature of the action." [William L.] Prosser, [Handbook of the] Law of Torts [§ 15 at 80-81 (4th ed. 1971)]. In Restatement [(Second) of Torts § 222A at 431 (1965) (Restatement)], it is stated: "(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Therefore it can be seen that not all exercise of dominion over or interferences with the use of chattels constitute conversion.

---

[4]Under Neb. U.C.C. § 9-301(2), "While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral." The record is not entirely clear as to the location of the equipment at issue. But the parties generally agree the equipment was located in Nebraska and Wyoming and do not dispute the district court's conclusion that the law of those states is substantively the same. At oral argument, counsel speculated some equipment may have been in South Dakota, but that possibility is not indicated anywhere in the record.

-8-

Polley v. Shoemaker, 266 N.W.2d 222, 225 (Neb. 1978).

>        In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
>        (a) the extent and duration of the actor's exercise of dominion or control;
>        (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>        (c) the actor's good faith;
>        (d) the extent and duration of the resulting interference with the other's right of control;
>        (e) the harm done to the chattel;
>        (f) the inconvenience and expense caused to the other.

Restatement § 222A(2) at 431.

Applying this legal framework, the district court determined the sale and leaseback and subsequent assignment to Republic "did not deny PVB any right it possessed in the [Heggem] Equipment" because appellees "took ownership . . . subject to PVB's security interest" and did not significantly interfere with PVB's use and enjoyment of the equipment or its possession of the equipment upon Heggem's default. The district court concluded any interference with PVB's rights was not so serious or important as to constitute conversion.

On appeal, PVB concedes Tetra's purchase of the equipment from Heggem was not a conversion, see Neb. U.C.C. § 9-401(b) (explaining a debtor generally retains the power to sell collateral despite provisions in the security agreement prohibiting transfer), but maintains appellees' actions after that point constitute conversion. PVB lists three factors it contends establish appellees' liability for conversion: (1) appellees' failure to recognize PVB's security interest in the transaction

-9-

documents for the sale and leaseback and the sale and assignment; (2) Tetra's lease of the equipment to Heggem without forwarding Heggem's lease payments to PVB;[5] and (3) appellees' knowledge of PVB's security interest and efforts to structure their financing transaction with Heggem to protect their interests in the absence of a subordination agreement. In PVB's view, out of concern Heggem would be making lease payments rather than paying PVB, appellees should have called off the whole transaction once it learned PVB had an interest in the equipment.

But the law does not require a subsequent creditor to reject an encumbered asset as potential collateral or to treat an existing creditor's interests as paramount to avoid facing liability for conversion. The U.C.C. contemplates multiple security interests in the same collateral and devised a system for determining the priority of those interests should they ripen. See, e.g., Neb. U.C.C. §§ 9-317 to 9-339.

Heggem sought additional financing to put its equipment to further use for its business.[6] Unfortunately, Heggem's plans failed and its business faltered. Heggem stopped making payments on the PVB loan, and PVB sought to exercise its secured-party rights in the equipment. When PVB went to take possession of the equipment, appellees did not object or interfere with PVB's right of control. Appellees'

_____

[5]In its opening brief, PVB notes Heggem's lease payments "would have been proceeds of PVB's collateral pursuant to UCC § 9-102(a)(64) . . . to which PVB's security interest would attach under UCC § 9-315(a)." In its reply and at oral argument, PVB conceded it has not argued appellees converted the lease payments as a separate claim, instead arguing appellees' "receipt and retention" of the lease payments was "merely one of the factors establishing the conversion" of the equipment. In light of PVB's concession, we need not consider whether appellees converted the lease payments.

[6]The PVB security agreement may have prohibited Heggem from using the equipment as collateral for additional financing. That potential alternative basis for Heggem's default does not affect our conversion analysis.

-10-

transaction documents may not have adequately recognized PVB's security interest, but appellees did not dispute PVB's interest when it mattered most.

Because Heggem always maintained possession of the equipment, PVB was able to recover the equipment intact, liquidate it, and use the amount received to pay down Heggem's loan, just as it would had Heggem never sold the equipment or obtained financing from appellees. Appellees' purchase of the equipment did not substantially alter the condition or location of the equipment, increase PVB's expense or inconvenience in recovering the equipment, or hinder PVB's right to possess the equipment upon Heggem's default and sell it to satisfy Heggem's obligations.

PVB simply fails to articulate any harm it suffered that was so substantial that justice would require appellees to pay PVB the full value of the equipment. The district court did not err in concluding any interference by appellees with PVB's right in the equipment was not so serious or important as to constitute conversion.

### D. Deposit Account

PVB contends appellees converted the proceeds of PVB's collateral by depositing the amount appellees paid for the Heggem equipment into the holdback account and applying the funds in the account to Heggem's obligations under the lease. See Neb. U.C.C. § 9-102(64) (defining proceeds to include "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral"). The district court determined "[w]hether PVB's security interest attached to the [h]oldback [a]mount is unclear," but found it "need not decide this issue because even if it is assumed PVB's security interest attached, PVB would still not be entitled to the [h]oldback [a]mount." We agree.

PVB does not dispute the district court's determination that the holdback account was a "deposit account," as defined in U.C.C. § 102(a)(29). See Neb. U.C.C. § 9-102(a)(29). Under Neb. U.C.C. § 9-304, Utah law "governs perfection, the effect

-11-

of perfection or nonperfection, and the priority of a security interest in a deposit account maintained with [Republic]" because Republic is a Utah corporation. Utah law provides,

> (1) A security interest held by a secured party having control of the deposit account under Section 70A-9a-104 has priority over a conflicting security interest held by a secured party that does not have control.
>
> . . . .
>
> (3) Except as otherwise provided in Subsection (4), a security interest held by the bank with which the deposit account is maintained has priority over a conflicting security interest held by another secured party.

Utah Code Ann. § 70A-9a-327.

> A secured party has control of a deposit account if:
>
>     (a) the secured party is the bank with which the deposit account is maintained; [or]
>
>   . . . .
>
>     (c) the secured party becomes the bank's customer with respect to the deposit account.

Utah Code Ann. § 70A-9a-104(1). Comment 3 to U.C.C. § 9-327 states "security interests perfected by control [under paragraph (1)] . . . take priority over those

perfected otherwise, e.g., as identifiable cash proceeds under Section 9-315."[7] Comment 4 explains,

> Under paragraph (3), the security interest of the bank with which the deposit account is maintained normally takes priority over all other conflicting security interests in the deposit account, regardless of whether the deposit account constitutes the competing secured party's original collateral or its proceeds. A rule of this kind enables banks to extend credit to their depositors without the need to examine either the public record or their own records to determine whether another party might have a security interest in the deposit account.

PVB acknowledges Republic had possession and control of the holdback account from the time Republic transferred funds into the account until Republic applied the account balance to Heggem's obligations under the lease. PVB further acknowledges Utah Code Ann. § 70A-9a-327(3) could provide Republic with an argument that Republic had a superior security interest in the holdback account.

However, PVB contends Republic cannot successfully argue Republic has priority under Utah Code Ann. § 70A-9a-327(3) because Heggem never granted Tetra, and by assignment Republic, a security interest in the holdback account. See Utah Code Ann. § 70A-9a-203(2)(c)(iv) (explaining a security interest in a deposit account is only enforceable against third parties if "the secured party has control . . . pursuant to the debtor's security agreement"). According to PVB, Heggem's agreement with Tetra and the transaction documents, including the security agreement, contemplated the holdback amount being placed in an "instrument" and

---

[7]"The official comments to the UCC have not been adopted by the Utah legislature and are therefore not authoritative, but rather, persuasive as to the code's interpretation." J.R. Simplot Co. v. Sales King Int'l, Inc., 17 P.3d 1100, 1108 (Utah 2000).

-13-

did not give Tetra or Republic control over a "deposit account." As PVB points out, the distinction is significant under U.C.C. § 9-327, which does not apply to accounts evidenced by an "instrument." See U.C.C. § 9-327 cmt. 2 (stating U.C.C. § 9-327 "does not apply to accounts evidenced by an instrument (e.g., certain certificates of deposit), which by definition are not deposit accounts").

PVB raises an interesting issue with respect to whether Heggem granted Tetra, and by assignment Republic, a security interest in the holdback account based on the granting language in the security agreement. But the argument comes too late. PVB did not raise this argument before the district court in its brief in support of its motion for summary judgment or in opposing appellees' motion. "Absent exceptional circumstances," not present here, "we cannot consider issues not raised in the district court." Shanklin v. Fitzgerald, 397 F.3d 596, 601 (8th Cir. 2005).

PVB does not otherwise challenge the district court's determination that Republic's security interest in the holdback account was superior to any interest PVB may have had in the account as proceeds. PVB also does not challenge the district court's conclusion "[a] secured party that holds a security interest in a deposit account by control is permitted to apply the balance of the deposit account against the obligation the deposit account secures." See Myers v. Christensen, 776 N.W.2d 201, 206 (Neb. 2009) (explaining after a default, a secured party who "holds a security interest in a deposit account perfected by control . . . may apply the balance of the deposit account to the obligation secured by the deposit account" (quoting Neb. U.C.C. § 9-607(a)(4) (internal quotation marks omitted))).

PVB does challenge the district court's determination that "no conversion occurred" under the circumstances of this case. PVB asserts "even if UCC § 9-327 did give [appellees] priority to the [holdback account], . . . such would not relieve [appellees] of liability to PVB for conversion of its collateral proceeds" because the

priority provisions of U.C.C. § 9-327 "do not protect the secured party for wrongful actions taken with regard to [conflicting security interests in the deposit account]."

According to PVB, the district court "failed to recognize . . . [appellees], not [Heggem] . . . transferred the proceeds of the [Heggem] Equipment" into the holdback account and later used the funds "to satisfy [Heggem's] obligations . . . under the lease." PVB maintains "[i]t is these actions . . . that constitute conversion of PVB's collateral." PVB analogizes appellees' actions to the second example in U.C.C. § 9-332 comment 2, in which the commentators indicate a depository bank that holds a superior interest in a deposit account maintained at the bank potentially could be liable to a creditor with a junior interest based upon the depository bank's wrongful conduct in colluding with the debtor to violate the junior creditor's rights.

PVB's assertion that priority does not necessarily preclude liability for conversion may have merit, but PVB again fails to demonstrate conversion on the facts of this case. Though stopping short of claiming appellees colluded with Heggem, PVB ascribes nefarious motives to appellees and characterizes their actions as somehow underhanded or wrongful without citing anything in the record to support those contentions. The undisputed facts in the record indicate appellees agreed to provide new financing to a distressed borrower and at least hoped to have PVB subordinate its security interest in Heggem's assets. When appellees' efforts to obtain a subordination agreement failed, appellees structured the transaction to minimize their risk and protect their interest in the new funds they provided.

"The primary purpose of Article 9 . . . was to simplify and lend certainty to procedures for establishing security interests" to facilitate efficient and effective financing and allow creditors to allocate the risk of providing credit. See N. Platte State Bank v. Prod. Credit Ass'n of N. Platte, 200 N.W.2d 1, 4 (Neb. 1972); accord Boatmen's Nat'l Bank of St. Louis v. Sears, Roebuck & Co., 106 F.3d 227, 230-31 (8th Cir. 1997) ("A fundamental purpose of Article 9 is 'to create commercial

-15-

certainty and predictability by allowing [creditors] to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9.'" (quoting Carlson v. Tandy Computer Leasing, 803 F.2d 391, 394 (8th Cir. 1986))) (alteration in Boatmen's); J.R. Simplot, 17 P.3d at 1104 (similar). The scope of Revised Article 9 was expanded to include provisions covering the perfection and priority of deposit accounts as original collateral and included special rules for banks. See Utah Code Ann. §§ 70A-9a-327 and U.C.C. § 9-101 cmts. 4(a) and (e).

Simply making use of those provisions, without more, does not constitute conversion. Rather than underhanded or wrongful, the actions PVB challenges in this appeal were consistent with the purpose of Utah Code Ann. § 70A-9a-327. A new creditor like appellees would not be willing to provide additional financing to a distressed borrower like Heggem if it could not secure the debt or if the funds the creditor provided were immediately subject to superior security interests upon closing.

Republic funded the Heggem transaction with new money and did not resist PVB's repossession and sale of the collateral that originally secured PVB's loan. Republic's application of the funds it transferred to the holdback account to satisfy Heggem's obligations under the lease did not materially change PVB's position from where PVB would have been, had the transaction between appellees and Heggem never occurred. Because PVB has failed to articulate any significant harm it suffered as a result of appellees' actions with respect to the holdback account, the district court did not err in concluding no conversion occurred.

## III. CONCLUSION
We affirm.

_____

-16-